[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14424
_____

D.C. Docket No. 6:13-cv-00855-GAP-GJK

JAMES RYAN SINGLETARY,

Plaintiff–Appellee,

versus

JUAN VARGAS,
in his individual capacity,

Defendant–Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(October 29, 2015)

Before WILLIAM PRYOR, JULIE CARNES, and SILER,[*] Circuit Judges.

JULIE CARNES, Circuit Judge:

In August of 2012, Defendant Juan Vargas, a deputy with the Brevard County Sheriff's Office ("Sheriff's Office"), provided back-up during a drug bust of the driver of a vehicle in which Plaintiff James Singletary was a passenger. Perceiving that this vehicle was trying to run him down as he stood in front of it, Defendant fired shots at the car as he was falling to the ground. One of those shots hit Plaintiff, causing serious injury to his leg. Plaintiff sued Defendant in his individual capacity under 42 U.S.C. § 1983, contending that the above response by Defendant constituted excessive force in violation of the Fourth Amendment.[1] Defendant moved for summary judgment on the ground of qualified immunity. The district court denied the motion and Defendant now appeals. We conclude that Defendant is entitled to qualified immunity, **REVERSE** the district court's ruling on Defendant's motion for summary judgment, and direct that court to enter judgment consistent with this opinion.

---

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

[1] An excessive force claim that arises in the context of an arrest or investigatory stop implicates the Fourth Amendment's protection against unreasonable seizures of the person. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989).

## BACKGROUND

### I.    Factual Background[2]

While interviewing a drug suspect in July 2012, Sheriff's Office Deputy

Thomas Walter obtained the number of a cellphone purportedly used to conduct

illegal drug deals.[3]  Posing as an interested customer, Walter texted the number

and indicated that he was looking to buy marijuana and oxycodone.  Eventually

directed to a second number, he this time texted that he wanted to buy high-grade

marijuana.  In response, the person at the other end of the text communication

replied, "[C]ome see me."

Deputy Walter showed these texts to his supervisor, Lt. Jeffrey Ludwig, who

decided to set up an operation to investigate this individual who appeared receptive

to Walter's efforts to purchase drugs.  Defendant Vargas was assigned to the

tactical support team for the operation.

Around 11:00 p.m. on August 3, 2012, Lt. Ludwig met with Walter and

several other deputies, including Defendant Vargas, to discuss the planned

---

[2]  In our review of the district court's summary judgment ruling, we accept Plaintiff's version of the facts and draw all inferences in the light most favorable to Plaintiff, the non-movant. *See Tolan v. Cotton*, __ U.S. __, 134 S. Ct. 1861, 1866 (2014) ("[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.").  However, we accept Defendant's factual assertions when they are based on undisputed evidence and have not been contradicted by Plaintiff. *See Scott v. Harris*, 550 U.S. 372, 379 (2007) ("[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." (quoting Fed. R. Civ. P. 56(c))).

[3]  Deputy Walter was a member of the Street Crimes Unit in the Sheriff's Office.  The Street Crimes Unit conducted targeted operations, such as drug investigations.

operation.  The plan was relatively simple.  Walter would send another text proposing a drug buy at an agreed-upon location.  Deputy Jason Roberts, dressed in plain clothes, would play the role of the drug purchaser.  Followed by covert tactical personnel and Sheriff's Office deputies, Roberts would meet the suspect at the designated location, after which the other deputies would conduct a "felony stop" and investigation.

Following this planning session, Deputy Walter sent a text to the second number, stating that he wanted to buy $100 worth of marijuana.  He received a response indicating that marijuana and oxycodone were available for purchase.  Walter and the suspect agreed to meet at a nearby Sunoco gas station to conduct the deal.  Deputy Roberts then began walking to this Sunoco station.  Joined by Corporal Lyndale Smith and his service dog, Defendant moved to the back of the gas station, where he was concealed but could still observe Deputy Roberts.  Two marked and two unmarked police cars hid themselves in other areas around the station.  Lt. Ludwig remained about a quarter mile away, maintaining contact with the other officers via radio.

Based on Walter's earlier investigation, the deputies anticipated that the suspect would arrive in a red Toyota.  And in fact, at about 1:00 a.m., a red Toyota pulled into the Sunoco station.  As the officers later learned, the car was driven by Nicholas Lechner, with Plaintiff riding in the passenger seat.  As the car turned

4

into the station, Deputy Roberts told Lt. Ludwig over the phone: "This is the car. This is the car." Lt. Ludwig then gave the "go" signal to the deputies. After waiting about 15–20 seconds, Defendant and Corporal Smith moved toward the car. Wearing his tactical uniform and patrol hat, Defendant loudly shouted, "Sheriff's office, let me see your hands," as he approached the car.

Helpful to our review in this case, a surveillance video captured Defendant's approach and the incident that followed.[4] The video first shows Roberts, the putative purchaser, walking to the passenger window and then around the back and toward the driver's side of the car. Shortly thereafter, Corporal Smith and his dog are seen running toward the passenger side of the car, with Defendant following slightly behind. Smith stops and points his handgun at the passenger window, while Defendant continues walking toward the front of the car. Defendant makes his way to the front of the car, as evidenced by the fact that the front right headlight of the car can be seen shining directly on his left pants leg. As soon as Defendant reaches this position, the car suddenly accelerates toward him, and the car's headlight beam can be seen moving up Defendant's pants leg as the car moves forward. Almost immediately, Defendant begins falling to the ground and, within one to two seconds of its initial acceleration, the car abruptly stops. While

---

[4] Several surveillance videos captured the incident. We describe and rely on the video with the best angle.

5

Defendant is on the ground near the right front tire, the car briefly rolls forward a second time, then stops again.

Because the video has no audio component, it does not reveal when the gunshots at issue in this case were fired. Defendant, Lechner, and Plaintiff each offered statements on that matter. Defendant testified that after approaching from the passenger's side of the car, he moved to the front of the car, at which point he stopped when the vehicle started coming toward him. Defendant tried to backpedal, but the right passenger side bumper struck him in the left leg, causing him to lose his balance, and he fell to the left. According to his testimony, he fired the first shot[5] while the car was still accelerating. His first shot would have occurred "at the same time" as the vehicle made contact with him or "maybe . . . half a second sooner." He pulled the trigger on his weapon four times, "as quick as [he] could," and was "firing the rounds as [he was] falling to the ground." Corroborating Defendant's testimony regarding the timing of events, Lechner confirmed in an initial statement given shortly after the incident that the shots by the officer were fired as the car was moving, but he also stated that the car never actually struck Defendant.[6]

Understandably, given how quickly everything happened and how

---

[5] As to the subsequent three shots, all witnesses appear to agree that these shots were fired in quick succession after the first shot.

[6] Lechner asserted his Fifth Amendment rights and refused to testify under oath at his deposition.

unanticipated were the turn of events from Plaintiff's point of view, his account of the chronology was not very specific. He gave a statement two days after the incident and admitted that after the undercover officer had walked to Lechner's side of the window, "everything's pretty much just a blur." He recalled that he put his hands up and "the next thing that happened [he] was getting shot through the passenger side of the door." He opined that perhaps the officers thought Lechner was putting the car into the drive gear, but "[e]verything happened so fast . . . [he] wasn't paying attention." As to the timing of the shots, he stated that they occurred about two seconds after the undercover officer had walked to the driver's side of the car. He was uncertain whether the car had rolled forward once the officers approached, and he never saw Defendant fall down. In fact, it was his belief that Defendant was not standing in front of the car but that instead he was standing to the right side of the front of the car when the events unfolded.

Plaintiff was deposed over eighteen months later. He testified that he saw only one of the two deputies who approached the car, but it is unclear from his testimony whether it was Corporal Smith or Defendant whom he saw. As to the timing of the acceleration of the car, Plaintiff indicated that when Lechner began talking to the undercover officer, Plaintiff asked Lechner to leave and take him home, at which point Lechner began pulling out of the parking lot. After Lechner began pulling out, Plaintiff saw a figure (one of the deputies) running toward his

7

side of the car, at which point Lechner hit the brakes.  Either right after Lechner hit the brakes or just as he hit the brakes, "the sky just lit up" "like fireworks, and they were shooting in the car."  The car was no longer moving when Plaintiff heard the gunshots.  He never felt the car hit anyone or saw the car hit a deputy.

After the above events, officers found in the car a semiautomatic handgun in its locked glove compartment; a plastic bag containing 48 grams, plus nine smaller bags, of marijuana; and a cellphone containing the text messages sent between Deputy Walter and the suspect.  Based on his acceleration of the car toward Defendant, Lechner was charged with battery on a police officer.  He pled guilty to aggravated assault on a police officer, although he did not enter his plea until after the close of discovery and over two months after Defendant filed his motion for summary judgment in this case.  In his plea, Lechner admitted that he had assaulted Defendant by "driving at him with a motor vehicle and causing in him a fear that violence was about to take place and that the motor vehicle would constitute a deadly weapon."

## II.    **Procedural History**

Plaintiff filed the present action, asserting § 1983 claims against Defendant and Lt. Ludwig, in their individual capacities.[7]  At the close of discovery, both defendants moved for summary judgment on the ground of qualified immunity.  As

---

[7]  Plaintiff also asserted a § 1983 claim against the Sheriff in his official capacity.  That claim was dismissed by agreement of the parties.

noted, a few months after the motion was filed and also after Plaintiff had filed his response, Lechner entered his guilty plea to aggravated assault on a police officer. Defendant moved for leave to submit the plea transcript, which contained Lechner's admission to "driving [the car] at" Defendant. The district court refused to allow Defendant to submit this transcript, and it subsequently denied Defendant's motion for summary judgment.[8]

In its summary judgment order, the district court acknowledged that Defendant was acting within his discretionary authority when he shot Plaintiff, and that it was therefore Plaintiff's burden to show that qualified immunity was not justified. But it concluded that Plaintiff had met this burden based on the court's determination that a reasonable officer would not have used deadly force under the circumstances. According to the court, Defendant had no reason to believe the suspect was dangerous because the crime under investigation involved only a $100 drug deal. Further, although the court acknowledged that an officer who reasonably believed Lechner was trying to run him over would have been justified in using deadly force, the court found that material questions of fact existed as to whether Defendant could have reasonably perceived that he was in danger. In reaching this conclusion, the court relied on (1) Plaintiff's testimony that

---

[8] The court did, however, grant summary judgment to Lt. Ludwig, noting that he was a quarter mile away when the shooting occurred and further finding no basis for imposing liability under a supervisory theory.

9

Defendant was not in the car's path as it accelerated and that the car was stopped when Defendant began shooting and (2) the fact that the bullet holes were found in the side of the car, rather than in the front.

Defendant filed a motion for reconsideration, again raising Lechner's admission at his guilty plea hearing that he assaulted Defendant by "driving at him" with the car. The district court denied the motion, stating that the new evidence "would not change the Court's opinion that a jury question exists as to the reasonableness of the force used" by Defendant. Defendant has appealed both the district court's summary judgment order and its order denying reconsideration.

## DISCUSSION

### I.    Standard of Review

"We review *de novo* a district court's denial of summary judgment based on qualified immunity, applying the same legal standards that governed the district court." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013). In conducting our review, we construe the evidence in favor of the plaintiff and decide whether the defendant is entitled to qualified immunity under the plaintiff's version of the facts. *Id.*; *see also Tolan v. Cotton*, __ U.S. __, 134 S. Ct. 1861, 1866 (2014) (noting, in a qualified immunity case, "the importance of drawing inferences in favor of the nonmovant"). We acknowledge that the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual

10

facts of the case." *McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009) (internal quotation marks omitted).  Nevertheless, we view the facts from the plaintiff's perspective because the determinative issue on appeal is "not which facts the parties might be able to prove" but rather whether "certain given facts" demonstrate a violation of clearly established law.  *Crenshaw v. Lister*, 556 F.3d 1283, 1289 (11th Cir. 2009) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002)).

## II.    Qualified Immunity

Resolution of Defendant's appeal requires us to decide whether Plaintiff proved that Defendant was not entitled to qualified immunity for his actions.[9] Qualified immunity balances two important interests:  the need to hold accountable a public official who has irresponsibly exercised his power and the obligation to protect from liability an official who has reasonably performed his duties.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  We are required to grant qualified immunity to a defendant official unless the plaintiff can demonstrate two things: (1) that the facts, when construed in the plaintiff's favor, show that the official committed a constitutional violation and, if so, (2) that the law, at the time of the

---

[9]  Before he can claim entitlement to qualified immunity, a public official must first show he was engaged in a discretionary duty when the allegedly wrongful act occurred.  *Dalrymple v. Reno*, 334 F.3d 991, 995 (11th Cir. 2003).  Defendant was clearly acting within the scope of his discretionary authority when he shot at the car Lechner was driving, and Plaintiff does not disagree.

11

official's act, clearly established the unconstitutionality of that conduct. *McCullough,* 559 F.3d at 1205.

In our inquiry as to the first prong of the test, we do not deal in abstractions, but instead look carefully at the specific facts of the case. *Id*. at 1206. And before deciding whether a police officer has actually used excessive force, we must "slosh our way through the factbound morass of 'reasonableness'" because, in the end, "all that matters is whether [the officer's] actions were reasonable." *Scott v. Harris*, 550 U.S. 372, 383 (2007). As to the second prong of the test, even if the defendant official's acts are unconstitutional, he can be held liable only if the law so clearly established the wrongfulness of his conduct that any reasonable official in his place would have understood that he was violating the plaintiff's constitutional rights. *Plumhoff v. Rickard*, __ U.S. __, 134 S. Ct. 2012, 2023 (2014).

Viewing the evidence in the light most favorable to Plaintiff, we conclude that he has satisfied neither prong in this case, and therefore Defendant is entitled to summary judgment.

A.    Constitutional Violation

Plaintiff's excessive force claim is analyzed under the objective reasonableness standard of the Fourth Amendment. *Id.* at 2020 (citing *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985)). The

12

reasonableness standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (internal quotation marks omitted). Reasonableness in this context depends on all the circumstances relevant to an officer's decision to use force and the amount of force used. *See Jean–Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010). We view the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Plumhoff*, 134 S. Ct. at 2020 (internal quotation marks omitted). And we allow for the fact that officers are often required to make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (internal quotation marks omitted).

As to deadly force, a police officer may use such force to dispel a threat of serious physical harm to either the officer or others, or to prevent the escape of a suspect who threatens this harm. *McCullough*, 559 F.3d at 1206; *Morton v. Kirkwood*, 707 F.3d 1276, 1283 (11th Cir. 2013). The district court concluded that the deputies would have had no reasonable belief that either Lechner or Plaintiff posed a risk of serious harm to others had Lechner merely been trying to escape the

13

scene.[10]  Thus, the use of deadly force to stop a perceived escape attempt would have been excessive.  We agree with the district court on this point.

Defendant argues, however, that he fired his gun, not to prevent an escape, but in self-defense because he thought the car occupied by Plaintiff and Lechner was about to run him over.  We have held that it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has "probable cause to believe that his own life is in peril."  *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005).  For that reason, we have "consistently upheld" an officer's use of deadly force in cases where the officer reasonably believed his life was endangered by a suspect who "used or threatened to use his car as a weapon."  *McCullough*, 559 F.3d at 1207; *see also Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012) (granting qualified immunity where "an objectively reasonable law enforcement officer could well have perceived that [a] moving vehicle was being used as a deadly weapon").

Indeed, the district court acknowledged the above legal principle and recognized that had Defendant believed "Lechner was trying to run him over . . .

---

[10]  Although its holding did not rest on this fact, a point of emphasis in the district court's order was that the crime under investigation was a "minor, non-violent drug offense."  We agree with the district court that it would have been unreasonable to use deadly force to apprehend the suspect of such a crime in the absence of any other evidence to suggest he posed a danger. However, we also note Lt. Ludwig's undisputed testimony that officers investigating even minor drug crimes frequently encounter firearms and counter-surveillance equipment, meaning that in assessing the risks involved in such an investigation, a prudent officer must consider the possibility of a violent response from the subject.  And, in fact, in searching Lechner's car after his arrest, officers found a semiautomatic handgun and ammunition in the glove compartment.

[Defendant] would have been justified in using deadly force to stop the car." But taking the evidence in the light most favorable to Plaintiff, the court inferred that Defendant was not in the car's path and moreover that the car had stopped its forward movement before he began shooting. For this reason, the court concluded that Defendant "was not in danger of being hit by the car when he opened fire," and thus a reasonable officer in his position could not have had probable cause to believe that he was being threatened with the infliction of serious physical harm. And because Defendant was under no threat of serious physical injury, the court found his use of deadly force to be unreasonable, which conclusion disqualified Defendant from qualified immunity.

Because we, the district court, and the parties agree on the governing legal principles, the question before us then becomes whether the district court's construction of the evidence in the record was accurate. Having carefully reviewed that evidence in the light most favorable to Plaintiff, we disagree with the district court and conclude that a reasonable officer would have reasonably perceived that he was in imminent danger of being run over by Lechner's car. Thus, the officer's firing of his gun in an effort to stop the car did not constitute excessive force.

The district court reached its conclusion that Defendant was not in the path of the car and that the car was stationary when he fired his shots based largely on a few fragmentary statements in Plaintiff's deposition testimony. It is true that in

15

determining whether summary judgment is appropriate based on qualified immunity, a district court must generally consider the facts in the light most favorable to the plaintiff. *Scott*, 550 U.S. at 377. It is unclear whether Plaintiff's testimony on these points creates a viable dispute as to the above questions. Leaving aside the fact that in his original statement Plaintiff had said that the entire incident was pretty much a blur to him, that everything happened fast and he was not paying attention, and that he was uncertain whether the car had rolled forward once the officers had approached, we note that Plaintiff's somewhat clearer recollection during his deposition is likewise ambiguous. In fact, it is impossible to determine whether Plaintiff ever saw Defendant or whether his testimony instead referenced Corporal Smith. Plaintiff stated in his deposition that he could barely see anything at the time of the shooting because the parking lot was extremely dark. In addition, Plaintiff said that he saw only one of the two deputies who approached his side of the car. According to Plaintiff, he was looking out the passenger-side window when he saw the deputy approach. The video shows that Corporal Smith is the deputy who headed toward Plaintiff's side of the car and approached the passenger-side window, whereas Defendant, following behind, went toward the front of the car. If the deputy that Plaintiff observed was Smith, it means that he failed to observe the pivotal event in this case: whether the car accelerated toward Defendant when the latter was allegedly in front of the vehicle.

16

As to the timing of the shooting in relation to the stopping of the vehicle, Plaintiff recalled that Lechner hit the brakes at the same time as the deputy observed by Plaintiff approached his side of the car. Then, either at the moment that Lechner hit the brakes or right after, "the sky just lit up" and "they were shooting in the car." If shots were fired around the same time as Lechner hit the brakes, Plaintiff's testimony is largely consistent with Defendant's version of the timing of events.

But even if we spruce up Plaintiff's testimony and, as did the district court, infer him to be stating either that the car did not accelerate while Defendant was standing in front of it or that Defendant was never, at any time, standing in front of the car, the surveillance video conclusively rebuts such testimony. The video establishes that Defendant was in the path of the car when it accelerated because it shows the car's right front headlight beam shining directly on Defendant's left pants leg. As the car accelerates, the headlight beam moves up Defendant's pants leg until Defendant begins falling to the ground and the car comes to an abrupt stop.

It is true that that we construe the facts in the light most favorable to the non-moving party. But when "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it," a court should not adopt the contradicted version for purposes of ruling

17

on a motion for summary judgment. *Scott*, 550 U.S. at 380 (holding that where videotape footage clearly contradicted the non-movant's testimony, the district court should not have relied on the testimony in resolving the motion for summary judgment on a Fourth Amendment excessive force claim). This is so because when the non-movant's assertion is "so utterly discredited" by the record, no "genuine" dispute of material fact exists sufficient to prompt an inference on behalf of the non-movant. *Id.*

And that is the case here. Given the video evidence, Plaintiff's testimony cannot call into question Defendant's assertion that he was in the path of Lechner's car when the latter accelerated toward him, thereby causing Defendant to reasonably fear for his life. As to the district court's reliance on Plaintiff's testimony that Lechner applied the brakes at the same moment the shots rang out, we assume this assertion to be true, but it does not create an issue of fact as to whether any danger had dissipated in the split-second immediately preceding Defendant's decision to use deadly force. *See Robinson*, 415 F.3d at 1256 ("Even if in hindsight the facts show that [the defendant] perhaps could have escaped unharmed, we conclude that a reasonable officer could have perceived that [the suspect] was using the [car] as a deadly weapon."). Moreover, whether the car hit Defendant or just rapidly accelerated toward him, it would have been reasonable for Defendant to fear for his safety. *See Long v. Slaton*, 508 F.3d 576, 581 (11th

18

Cir. 2007) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."). Indeed, when previously addressing circumstances that are not materially distinguishable from the facts here, we found an officer's use of deadly force to be constitutional. *See Robinson*, 415 F.3d at 1256 (upholding an officer's use of deadly force against a suspect who slowly—at one or two miles per hour—drove a vehicle toward the officer as he stood between the suspect's vehicle and a parked car).

Nor do we find persuasive the district court's observation that, although not dispositive, the location of the bullet holes in the side of the car, not the front, "also supports a conclusion that [Defendant] was not in danger of being hit by the car when he opened fire." Again, the surveillance video clearly shows that Defendant was in the path of the car when it accelerated. The only ballistics evidence in the record is the report of defense expert Richard Ernest,[11] who concluded that the shots entered the side of the car because of the direction Defendant was falling when he began firing, and not because Defendant was standing at the side of the car when he began shooting.

---

[11] Plaintiff's expert, Robert Wyman, whom Plaintiff characterized as a "forensic photographer," opined that the shots originated from the passenger side, as opposed to the front of the vehicle. Filing a *Daubert* motion to exclude consideration of Wyman's opinion, Defendant argued that Wyman lacked any specialized training in ballistics and that his opinion as to the origin of the shots was unreliable and based on speculation. Plaintiff did not oppose Defendant's motion, and the district court never referenced the Wyman testimony in its summary judgment order. Similarly, we do not consider Wyman's opinion on appeal.

19

In short, taking the evidence in the light most favorable to Plaintiff, we conclude that this evidence demonstrates that Lechner's car began accelerating toward Defendant as he stood in front of it and that his use of deadly force to stop what appeared to be an imminent threat to his life was not excessive. That being so, Defendant did not violate the Constitution when he responded with deadly force.

B.    Clearly Established Law

Even assuming a constitutional violation, Defendant is entitled to qualified immunity unless Plaintiff can show that his Fourth Amendment rights were "clearly established" at the time of the shooting. *Plumhoff*, 134 S. Ct. at 2023. To be clearly established, the contours of a right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* "The salient question is whether the state of the law at the time of an incident provided 'fair warning' to the defendant[] that [his] alleged conduct was unconstitutional." *Tolan*, 134 S. Ct. at 1866 (internal quotation marks omitted).

Fair warning is most commonly provided by materially similar precedent from the Supreme Court, this Court, or the highest state court in which the case arose. *See Terrell*, 668 F.3d at 1256. However, a "judicial precedent with materially identical facts is not essential for the law to be clearly established."

20

*Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010).  Authoritative judicial decisions may "establish broad principles of law" that are clearly applicable to the conduct at issue, and it may also be obvious from "explicit statutory or constitutional statements" that certain conduct is unconstitutional.  *Griffin Indus.*, *Inc. v. Irvin,* 496 F.3d 1189, 1209 (11th Cir. 2007); *see also Taylor v. Barkes*, __ U.S. __, 135 S. Ct. 2042, 2044 (2015) ("We do not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." (internal quotation marks omitted)).

As explained above, it is well established that an officer may constitutionally use deadly force when his life is threatened by a car that is being used as a deadly weapon.  *See Robinson*, 415 F.3d at 1256; *McCullough*, 559 F.3d at 1207.  The district court thus acknowledged that Defendant would be entitled to qualified immunity if he reasonably believed Lechner was trying to run him over with the car and thus feared for his safety.  The court nevertheless denied qualified immunity because it discounted undisputed video evidence showing that Defendant was in the path of the car when it accelerated and that he fired just as—or a split second after—Lechner hit the brakes.  Properly accounting for this evidence, our

21

case law did not put Defendant on notice that his use of deadly force violated any clearly established rights.[12]

## CONCLUSION

For all of the above reasons, we conclude that Defendant is entitled to qualified immunity as a matter of law.  Accordingly, we **REVERSE** the order of the district court denying his motion for summary judgment and direct that court to enter judgment consistent with this opinion.

---

[12] In support of his argument that Defendant had "fair warning," Plaintiff cites *Morton v. Kirkwood*, 707 F.3d 1276 (11th Cir. 2013):  a case in which an officer had pursued, and ultimately shot, the plaintiff in his car.  *Id.* at 1282.  Although the officer claimed he shot the plaintiff to prevent him from running over a fellow officer on the scene, the plaintiff disputed that testimony, stating that the officer could not have reasonably perceived a threat to his life because the plaintiff had put his car in park and raised his hands as soon as the officer identified himself.  *Id.*  Taking the facts in the light most favorable to the plaintiff, we denied the defendant qualified immunity because the evidence indicated that the officer "shot an unarmed man in a stationary vehicle while having no reason to believe that the man would place anyone's safety in danger."  *Id.*  The facts in *Morton* are clearly not the facts in this case, as the surveillance video here shows that Lechner's car did accelerate toward Defendant.  *See Robinson*, 415 F.3d at 1256 ("[T]he inquiry into whether the law is clearly established must be undertaken in light of the specific context of the case." (internal quotation marks omitted)).