[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-12239
Non-Argument Calendar
_____

D.C. Docket No. 8:14-cv-01376-JDW-MAP

NATASHA N. CLEMONS,
as Personal Representative of the
Estate of Rodney Mitchell and on behalf of
Channing Mitchell, survivor,
DORIAN GILMER,

Plaintiffs-Appellants,

versus

THOMAS M. KNIGHT,
Hon., in both his official and individual
capacity as Sheriff of Sarasota County,
TROY SASSE,
ADAM SHAW,

Defendants-Appellees.
_____

Appeal from the United States District Court
for the Middle District of Florida
_____
(October 12, 2016)

Before WILSON, WILLIAM PRYOR and ROSENBAUM, Circuit Judges.

PER CURIAM:

Natasha N. Clemons, as the personal representative of the estate of Rodney Mitchell, and Dorian Gilmer appeal the summary judgment in favor of Sheriff Thomas M. Knight and his two deputies, Troy Sasse and Adam Shaw. After the deputies stopped Mitchell for a traffic violation, Mitchell shifted his jeep into drive and drove toward Sasse, who was standing near the front of Mitchell's jeep. Both deputies fired shots at the jeep, and after one of the bullets struck Mitchell in the head and killed him, the jeep crashed into a nearby building and injured Gilmer. Clemons and Gilmer complained that the deputies' use of deadly force was excessive, that the Sheriff failed to train his deputies adequately, and that he was vicariously liable for the deputies' allegedly tortious conduct. *See* 42 U.S.C. § 1983; Fla. Stat. § 768.19. The district court ruled that Sasse and Shaw were entitled to qualified immunity and that the complaints against the Sheriff failed as a matter of law because the deputies' use of force was reasonable. We affirm.

## I. BACKGROUND

While on patrol around 9:30 p.m. on June 11, 2012, Shaw noticed a jeep traveling in the opposite direction on U.S. Highway 301. Shaw observed that the driver, Mitchell, was not wearing a seatbelt, so Shaw turned around, radioed for assistance while pursuing Mitchell, and activated his siren and lights to cause

2

Mitchell to stop. Mitchell continued down the highway, made a u-turn, and then made two right turns before stopping. Sasse heard Shaw's radio transmission and joined the pursuit. Both Sasse and Mitchell's passenger, Gilmer, recalled that Shaw activated his lights and siren after Mitchell made his first right turn.

Mitchell stopped alongside the curb on Washington Court and kept his foot on the brake and the jeep in drive. Shaw parked his patrol vehicle behind the jeep and approached Mitchell's door. Sasse parked his vehicle approximately 10 to 15 feet in front of the jeep and walked to the front of the vehicle. Later, Sasse and Gilmer recalled that Sasse positioned himself near the front driver's side tire.

Shaw ordered Mitchell several times to put his hands on the steering wheel, and eventually Mitchell complied. Shaw asked Mitchell why he had failed to stop earlier and ordered him to produce his license, but Mitchell ignored Shaw. Mitchell also ignored Shaw's instructions to shift the gear to park. Mitchell was "looking around" and refused to make eye contact with the deputies, and Sasse sensed that Mitchell "might be taking off." Finally, Mitchell shifted into park, but he left his hand on the gear shift.  Sasse could not see Mitchell's hand and, fearing that he might reach for a weapon, Sasse stepped backwards, drew his firearm, and ordered Mitchell to display his hands.

When Mitchell shifted the jeep back to drive, Shaw ordered Mitchell to stop. As Shaw reached across Mitchell toward the gear shift, Mitchell stepped on the

3

accelerator. Sasse, who thought that he was about to be struck, shot at the jeep twice and fell to the ground. One bullet struck the pillar in front of Mitchell's door. Shaw saw Sasse "falling out of the way" and thought that the jeep was going to run over him, so Shaw drew his firearm and shot twice toward Mitchell. A bullet struck Mitchell in the head.

Mitchell's jeep traveled over the median, across the lane for oncoming traffic, and crashed into a structure in front of a Sunoco gas station. When Shaw arrived at the gas station, Mitchell was slumped over and Gilmer was gone. Mitchell was pronounced dead at the scene. Gilmer later reported that he had been injured by broken glass and lead shrapnel.

Gilmer thrice confirmed that Mitchell's jeep moved as the deputies discharged their firearms. During his statement to an investigator, Gilmer stated that Mitchell shifted to park, but then turned his steering wheel to the right and shifted back to drive, which caused the jeep to lurch. And as the vehicle "jerked forward," Gilmer heard gunshots and saw a flash of light to his left. Eleven days after the incident, Gilmer, in the presence of his parents and his attorney, responded affirmatively when asked if he "heard the shots . . . [when Mitchell] goes to take off" and if Mitchell "was . . . going to take off fast to get, get away from everybody." Gilmer later wrote in a college essay that Mitchell "pulled over

4

to talk to the officers" and, "in an instance he tried to pull off, turning the car away from the officers" and "then the officers open[ed] fire into the vehicle."

## II. STANDARDS OF REVIEW

We review *de novo* a summary judgment and view the evidence in the light most favorable to the nonmoving party. *Singletary v. Vargas*, 804 F.3d 1174, 1180 (11th Cir. 2015). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## III. DISCUSSION

Clemons and Gilmer raise two issues on appeal. First, Clemons and Gilmer argue that the district court disregarded evidence that the deputies' use of deadly force was excessive. Second, Clemons and Gilmer argue that the Sheriff failed to implement policies and training to prevent his deputies from using excessive force and that the Sheriff was vicariously liable for his deputies' violations of state law. Our resolution of the first issue necessarily resolves the second issue too.

"[I]t is constitutionally permissible for an officer to use deadly force when [he] 'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Carr v. Tatangelo*, 338 F.3d 1259, 1268 (11th Cir. 2003) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)); *e.g., Singletary*, 804 F.3d at 1181; *Robinson v. Arrugueta,* 415 F.3d 1252, 1256

5

(11th Cir. 2005). Reasonableness is determined based on all the circumstances known to the officer on the scene. *Singletary*, 804 F.3d at 1181; *Terrell v. Smith*, 668 F.3d 1244, 1251 (11th Cir. 2012). That approach permits officers to "dispel [the] threat" of, not merely respond after the infliction of, a serious injury. *Singletary*, 804 F.3d at 1181 (citing *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009)); *see Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997). For that reason, "we have consistently upheld an officer's use of force . . . where a decedent used or threatened to use his car as a weapon to endanger officers . . . preceding the officer's use of deadly force." *Terrell*, 668 F.3d at 1253 (quoting *McCullough*, 559 F.3d at 1207 (alterations omitted)).

We agree with the district court that the deputies acted reasonably in response to a threat of serious physical harm to Sasse. Viewed in the light most favorable to the plaintiffs, the evidence established that Sasse faced the threat of serious physical injury because he was standing near the front of the jeep as Mitchell attempted to flee from the traffic stop. The deputies and Gilmer recalled that Sasse was positioned near the front driver's side corner of Mitchell's jeep and that the jeep moved before the deputies shot toward Mitchell. Both deputies also stated that they feared the jeep would hit Sasse.

The situation that confronted the officers is materially indistinguishable from *Singletary*, in which we concluded that an officer was immune from liability for

6

shooting a passenger in a vehicle whose driver was attempting to evade apprehension in a fast-paced drug bust. 804 F.3d at 1182–84. The officer did not use excessive force by shooting at the car, we reasoned, because he was standing near the front of the oncoming vehicle and was acting in self-defense. *Id.* at 1181. That outcome, we explained, was consistent with our precedents that upheld the use of deadly force "where the officer reasonably believed his life was endangered by a suspect who used or threatened to use his car as a weapon." *Id.* at 1181–82.

The deputies' use of deadly force did not violate Mitchell's and Gilmer's constitutional rights under the Fourth Amendment. In the light of Mitchell's evasive behavior and Sasse's presence near the front of Mitchell's jeep, both deputies reasonably feared that Mitchell's use of the jeep created an imminent danger of serious injury to Sasse. *See id.* at 1181. The deputies were entitled to fire their guns to protect Sasse. *See id.* at 1181–84; *Terrell*, 668 F.3d at 1253 (discussing cases in which officers were granted qualified immunity when the defendant used or threatened to use a vehicle as a weapon). Because the officers were justified in responding to the danger created by the jeep with deadly force, the deputies were immune from liability for Gilmer's injuries and for Mitchell's death.

Clemons and Gilmer argue that three witnesses who were standing "across U.S. 301" stated that the "gunshots preceded the sound of the engine accelerating," but those witnesses' accounts fail to create a material factual dispute about the

7

sequence of the events. *See Valderrama v. Rousseau*, 780 F.3d 1108, 1113–14 (11th Cir. 2015). The first witness, Chadrick Garner, stated that he "wasn't really paying that much attention" to the traffic stop "a little bit up the road" from his vantage point at the Sunoco gas station and that he heard gunshots followed by the "loud noise" of Mitchell's jeep speeding toward him at the station. Garner did not refute the facts that Mitchell's jeep at least moved before the deputies fired their shots. Garner instead offered the unremarkable observation that he heard the jeep accelerate as it came closer toward him. The second witness, Oscar Higdon, who also was at the gas station, stated that he heard "three [gun]shots" and "the Jeep didn't accelerate right away," but he immediately contradicted himself and stated that the Jeep accelerated "right when [he] heard the gunshots." Jesus Torres, the third witness, made conflicting statements about whether the jeep was moving at the time of the gunshots and testified that the deputies "never shot" at Mitchell. According to Torres, the deputies "were approaching [Mitchell] when he pulled [out] a gun and . . . [fired] two shots into the air," one deputy "threw himself down to the ground," and Mitchell's "car start[ed] to go . . . again."

Clemons and Gilmer also argue that their expert witnesses' testimonies established that Sasse was "out of harm's way," but the experts' opinions do not contradict the evidence that Sasse was at least near the front of the jeep. David Balash, a crime scene investigator, opined that Sasse was "at least 3–5 feet, or

8

further, to the left of the Jeep's front fender and in no danger of being struck," but Balash also testified that Sasse could have been 3 feet 11 inches from the jeep when he fired his gun. And Balash estimated that the bullet that lodged in the pillar of Mitchell's door was shot at a 25 to 30 degree angle, which he testified would have meant that Sasse was standing more in front of than beside the jeep. Although Melvin Tucker, an expert in police procedures, opined that Sasse "was not in danger of being struck" because he had "backed away from the [jeep] to create distance," Tucker testified that he "[didn't] think anybody [could]" determine how far Sasse was from the jeep. And Tucker acknowledged that Sasse was "by the left front tire of the vehicle." As the district court ruled, the experts' opinions did not "create a disputed issue of [material] fact" regarding "whether a reasonable officer could have perceived that Mitchell's vehicle posed a danger to Sasse when it suddenly accelerated."

The complaint against the Sheriff fails for related reasons. Because his deputies' actions did not violate Mitchell's and Gilmer's constitutional rights, the Sheriff cannot be faulted for inadequate supervision or training. *See Hicks v. Moore*, 422 F.3d 1246, 1253 (11th Cir. 2005). And the district court correctly ruled that the Sheriff was not vicariously liable for battery because the deputies' use of force was not excessive or for wrongful death because Mitchell's death was not "caused by a wrongful act."

## IV. CONCLUSION

We **AFFIRM** the summary judgment in favor of Deputies Shaw and Sasser and Sheriff Knight.