[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16166

_____

D.C. Docket No. 5:14-cv-00364-MTT

DEEANN HORN,

Plaintiff - Appellee

versus

WILLIAM BARRON,
Officer of former Macon Police Department,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(January 4, 2018)

Before MARCUS and NEWSOM, Circuit Judges, and BUCKLEW,[*] District Judge.

_____

[*]Honorable Susan C. Bucklew, United States District Judge for the Middle District of
Florida, sitting by designation.

PER CURIAM:

In this civil rights case, Defendant William Barron ("Officer Barron"), a police officer in the City of Macon, Georgia, appeals from the district court's denial of his motion for summary judgment on the basis of qualified immunity. Plaintiff, DeeAnn Horn ("Horn"), claims that Officer Barron violated her rights under the Fourth Amendment when he arrested her for disorderly conduct at a Luke Bryan concert in the Central City Park in Macon. The district court found that genuine issues of material fact barred summary judgment because the evidence conflicted on whether Horn resisted arrest and, therefore, whether the amount of force used in the arrest was necessary. Officer Barron then appealed to this Court. Given the facts of this case and the law from this Circuit on this issue in cases with materially similar facts, we conclude that Officer Barron is entitled to qualified immunity on Horn's excessive force claim. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## I.

### A.

On October 13, 2012, Horn attended a Luke Bryan concert with her ex-husband Kevin Horn, her 12-year-old daughter and 18-year old daughter. The concert promoters hired approximately 30 uniformed police officers to assist with

2

security and to enforce the law at the concert that night. Officer Barron was hired by the concert promoters, along with fellow Macon Police Officers Jason Bray ("Officer Bray") and Deborah Taylor ("Officer Taylor"). According to Officer Bray, the concert "was chaotic" with "anywhere between 15,000 to 20,000 people at this event."

Horn and her family arrived at the park around 2:00 p.m. and tailgated until approximately 7:00 p.m., when the gates opened to the concert. She claims that she drank only two beers during that time. After the gates opened, Horn and her family made their way as close to the stage as they could get. By the time Horn and her family made their way to the stage, a large crowd had already amassed together, standing shoulder-to-shoulder. Once the opening act started, three young women (ages 18 or 19) tried to push past Horn and her family in order to move closer to the stage. One of the women pushed Horn into the person in front of her, and Horn shoved the woman back. Horn and that woman then exchanged "heated words," including "bitch" and possibly "the F-word," for one to two minutes. There were young children present. Shortly thereafter, two security officers approached Horn and told her to go with them, but Horn refused to leave. She told them that she had done nothing wrong and that the one young woman, who was nowhere to be found at this point, was the one who had pushed her.

3

These two security officers then informed Officers Bray and Taylor that Horn had shoved another woman and that Horn was refusing to leave with them. Officers Bray and Taylor then approached Horn and she refused to leave with them as well. They testified in their depositions that she stated, "I didn't do any fucking thing. This is bullshit" and then twice said "this is fucking bullshit. I'm not going anywhere." Officer Bray described Horn as being "uncooperative" and "very belligerent," and Officer Taylor described Horn as "loud and belligerent" and "acting a fool." Officer Bray testified that while Horn was using profanity, there were several young kids and several adults around, and that "maybe" three kids were under the age of fourteen. Officer Taylor testified that "probably two or three" children under the age of 12 were around. Kevin Horn testified in his deposition that there were men, women, and children of all ages around.

While Officer Bray escorted Horn out of the concert, Officer Taylor, who walked behind them, said Horn consistently pulled her arm away from Officer Bray. Horn denied that she resisted and testified in her deposition that Officer Bray "dragged her through the crowd." According to Horn, when they reached the gate, Officers Bray and Taylor "slung [her] out." Horn stayed at the exit to learn why she was being ejected. Officer Barron, who was not involved in escorting Horn out of the concert, was already near the gate and stayed to watch Horn because he "wasn't

4

sure if [Officer Bray] was . . . finished with her." Officer Bray testified in his deposition that he intended to write Horn a citation for disorderly conduct because she "used profane language in front of kids under fourteen years of age," but before he was able to do so, he had to attend to another concert-goer who had poured a beer down his shirt as he was removing Horn from the concert.

While Horn was being escorted out of the concert, two of the young women who were involved in the physical altercation with Horn approached Officer Barron and told him they had been assaulted. One said she had been grabbed around the throat and choked. The other had a bloody nose and contusions in her eye area. The women explained that this altercation came about "because they were breaking in line, getting closer to the stage [] than the suspect was, and that made [the assailant] mad." The women identified Horn as the assailant. Horn's daughters heard the young women identify Horn as the one who had hit them. Officer Barron only knew about Horn's alleged physical altercation because these two women told him about it. He did not witness the event, nor did he speak with Officers Bray and Taylor about why they were escorting Horn from the concert.

Horn testified in her deposition that while she was at the park's exit gate, she was "pissed off" that no one ever asked her what happened or explained why she had been removed from the concert. Officer Barron testified in his deposition that Horn,

5

who was 10 feet away from him, "was telling [him] to 'fuck off' and 'fuck you' and 'I didn't do a fucking thing'" and pointing her finger to him. He also testified that he "didn't know if [Horn] was going to attack [him] when she started throwing the profanities out at [him]" and "walk[ing] toward [him]." Horn admits that while she cannot remember every word she said, she did use profanity and said "don't y'all want to know what f'ing happened; why am I the one that can't stay in the concert; there's two sides to the story; where's the girl; don't y'all want to know what my side of the story is; don't y'all want to know what happened." She stated that she was "25, 30" feet away from Officer Barron at this time. Kevin Horn testified in his deposition that Horn said, "why the fuck do I got to be thrown out?" and "why do we got to fucking leave?" Officer Taylor was also in the area, but she testified in her deposition that she did not recall hearing Horn use any profanity while she was yelling from the gate.

Officer Barron decided to arrest Horn for disorderly conduct and, thus, approached her and took hold of her left arm. Officer Barron did not announce to Horn that she was under arrest or that he was going to handcuff her. As Officer Barron was attempting to arrest Horn, she pulled her arm away from him. Officer Barron then used a soft hands, straight arm bar takedown technique in order to gain control of Horn, by which he took hold of her left arm, put his right arm over it, and

6

brought her to the ground using gravity and his own weight. Horn claims that a bone in her arm snapped when she hit the ground.

Once Horn was on the ground, Officer Barron put his knees in her back to handcuff her, but before he could do so, Kevin Horn grabbed him from behind. At that point, Officer Barron released Horn's left arm because Kevin Horn was choking him. Officers Bray and Taylor quickly managed to subdue Kevin Horn, and then Officer Barron handcuffed Horn in front of her body because she said her arm was dislocated. Horn was subjected to no further exercise of force during her detention. Officer Bray wrote a disorderly conduct citation for Horn, and then he and Officer Taylor escorted her to jail. Later that night, Officer Barron wrote another disorderly conduct citation for Horn. At booking, Horn never requested medical care, but after being released, she went to the emergency room and underwent a CT scan that revealed she had a broken left humerus, for which she then underwent surgery.

During his Internal Affairs interview regarding the incident, Officer Barron stated that as a result of Horn cussing and pointing at him, he "went and placed . . . [Horn] into custody for disorderly conduct [and] grabbed her left arm." He later testified in his deposition that he was initially unable to place her in handcuffs because "[s]he jerked away and started walking away from [him]," and she got 14–15 feet away from him before he was able to grab her arm again and take her to the

ground. Officer Taylor told Internal Affairs that she saw Horn "actively resisting" Officer Barron and testified in her deposition that she saw Horn "intentionally br[eak] out of his hold so she could walk in the opposite direction." Horn's older daughter stated in her Internal Affairs interview that Horn "snatched back or moved back from him" when Officer Barron "put his hands on" Horn, and her 12-year-old daughter said Horn "hit back" after Officer Barron "put his hands on" her and "kind of pushed her." Horn disputes her daughters' accounts of the events. She stated to Internal Affairs that she would have complied with Officer Barron had he told her she was under arrest, but then later testified in her deposition that she did not resist and was "totally compliant."

## B.

On October 10, 2014, Horn filed the underlying lawsuit in the district court. She asserted federal claims pursuant to 42 U.S.C. § 1983 for failure to train and supervise against the Macon Police Department and Macon-Bibb County. She asserted federal claims for unlawful arrest in violation of the Fourth Amendment, retaliation in violation of the First Amendment, and retaliation and excessive force in violation of the Fourth Amendment against Officers Bray, Taylor, and Officer Barron. She asserted state law claims for negligent hiring, training, supervision, and retention against the Macon Police Department and Macon-Bibb County. She

8

asserted state law claims for false arrest, false imprisonment, assault, and battery against Officers Bray, Taylor, and Barron. The district court granted Defendants' motion for final summary judgment as to all of the claims except for the Fourth Amendment excessive force claim against Officer Barron. Officer Barron asserted qualified immunity as a defense, a defense that the district court rejected based on the existence of genuine issues of material fact.

## II.

Although the district court must view the evidence in the light most favorable to the non-moving party, summary judgment may be entered in favor of the movant "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). Therefore, a plaintiff must put forth sufficient evidence to "persuade the court that a reasonable fact finder could rule in the plaintiff's favor." *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1198 (11th Cir. 1997). We review *de novo* a district court's disposition of a summary judgment motion based on qualified immunity, applying the same legal

9

standards as the district court. *Singletary v. Vargas*, 804 F.3d 1174, 1180 (11th Cir. 2015) (citations omitted).

Officer Barron argues that the district court erroneously found that Horn put forth sufficient evidence to create a material issue of fact about whether she resisted arrest and, therefore, whether the use of force was unreasonable and in violation of clearly established law. We agree. It is well-established that qualified immunity protects government officials unless they violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982) (citations omitted). We have ruled that "only in exceptional cases will government actors have no shield against claims made against them in their *individual capacities*." *Braddy v. Fla. Dep't of Labor & Emp't Sec.*, 133 F.3d 797, 801 (11th Cir. 1998) (quoting *Lassiter v. Ala. A&M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994) (*en banc*)). The purpose of qualified immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation. *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987). Supreme Court precedent provides that "[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and

fact." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (internal quotation marks and citation omitted). Whether a defendant is entitled to qualified immunity is a question of law; in other words, whether the law at the time of the incident was clearly established so that a reasonable person should have known that he was violating it. *See Courson v. McMillian*, 939 F.2d 1479, 1487–88 (11th Cir. 1991).

To receive qualified immunity, the public official must first show that he was acting within the scope of his discretionary authority at the time the allegedly wrongful acts occurred. *See Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted). It is undisputed in this case that Officer Barron was acting within the scope of his discretionary authority while providing security and keeping the peace at a public venue. The burden therefore shifts to Horn to show that qualified immunity should not apply. *See Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012).

In order to find that Officer Barron is susceptible to suit, we must answer two questions in the affirmative. One, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer[s'] conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201,121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001), *modified*, *Pearson*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d

11

565 (holding that courts need not address *Saucier's* two prongs in sequential order). And two, was that right "clearly established"? *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156.

The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Ferraro*, 284 F.3d at 1194 (quoting *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156. In *Saucier*, the Supreme Court noted that "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." 533 U.S. at 201, 121 S. Ct. at 2156. However, if a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine whether the right was clearly established. *See id.*

A plaintiff "can demonstrate that the contours of the right were clearly established in several ways." *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012). First, a plaintiff can show that "a materially similar case has already been decided." *Id.* (internal quotations marks and citations omitted). Second, a plaintiff can point to a "broader, clearly established principle [that] should control the novel facts [of the] situation." *Id.* (alteration in original) (internal quotation marks and citation omitted). "Finally, the conduct involved in the case may so obviously violate[] th[e] constitution that prior case law is unnecessary." *Id.* (alterations in original) (citation

12

omitted). "Exact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (citations omitted).

Horn does not dispute that Officer Barron had probable cause to arrest her for disorderly conduct. Rather, she argues that the amount of force used by Officer Barron to effectuate her arrest, when viewed in the light most favorable to her, was illegally disproportionate under the circumstances and, therefore, violated her Fourth Amendment rights. We have held that "[t]he Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Ferraro*, 284 F.3d at 1197 (citing *Graham v. Connor*, 490 U.S. 386, 394–95, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989)). The question for us to consider is whether the officer's conduct is "objectively reasonable in light of the facts confronting the officer." *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015) (citation omitted). We begin by observing that "[w]hen an officer lawfully arrests an individual for the commission of a crime, no matter how minor the offense, the officer is entitled under controlling Supreme Court precedent to effectuate a full custodial arrest." *Ferarro*, 284 F.3d at 1196 (internal quotation marks and citation omitted).

13

Because the "objective reasonableness" standard applied to an officer's conduct is not capable of precise definition or mechanical application, factors to be considered "includ[e] the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872. Courts should also consider "the need for the application of force, . . . the relationship between the need and amount of force used, and . . . the extent of the injury inflicted." *Mobley*, 783 F.3d at 1353 (omissions in original) (quoting *Ferraro*, 284 F.3d at 1198). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 396 S. Ct. at 1872 (citation omitted). Courts must keep in mind that "[o]fficers facing disturbances 'are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly-evolving.'" *Kingsley v. Hendrickson*, ___ U.S. ___, ___, 135 S. Ct. 2466, 2474, 192 L. Ed. 2d 416 (2015) (quoting *Graham*, 490 U.S. at 397, 109 S. Ct. 1865).

The use of gratuitous force when a suspect is not resisting arrest violates the Fourth Amendment. *See Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008). However, "the application of de minimis force, without more, will not support an

14

excessive force claim" and "will not defeat an officer's qualified immunity." *Nolin v. Isbell*, 207 F.3d 1253, 1257–58 (11th Cir. 2000).

In denying summary judgment on qualified immunity, the district court concluded that this case presents two contradictory versions of what happened, Horn's version being that Officer Barron's use of force on her was gratuitous insofar as she merely pulled her arm away from him as a reflex to his touch and was not resisting him, and Officer Barron's version being that Horn resisted his efforts to seize her by jerking or snatching her arm out of his hold. Citing *Hall v. Bennett*, 447 F. App'x 921, 924 (11th Cir. 2011), for the proposition that "two competing contradictory stories of what happened" creates a question of fact, the district court concluded that a question of fact existed as to whether the force Officer Barron used in arresting Horn was reasonable because, according to Horn, she was "totally compliant."

The district court determined that under Horn's version of events, the majority of the "objective reasonableness" factors weighed in her favor. With respect to the severity of her crime, it is undisputed that Officer Barron arrested Horn for a non-serious offense, disorderly conduct. *Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) (holding that "[d]isorderly conduct is not a serious offense"). Although Horn gave a statement to Internal Affairs that she would have complied

15

with Officer Barron had he told her she was under arrest, seemingly conceding that she resisted Officer Barron, she later testified in her deposition that she was "totally compliant," denied that she ever resisted Officer Barron, and disputed her daughters' versions of the events. Thus, according to Horn, she was not actively resisting arrest or attempting to flee, and there was no need for force beyond that which is ordinarily necessary to effectuate the arrest of a compliant individual. The district court then found that if the facts are credited to Horn, a reasonable jury could find that Horn's crime was not severe, that she was not resisting arrest or attempting to flee and simply pulled her arm towards herself in response to Officer Barron's touch, that the amount of force from the takedown was disproportionate to the need for such force, and that the use of force caused severe injury. We disagree.

Even assuming that Horn was totally compliant with Officer Barron, he was allowed to use some force in effecting her arrest. And, even if the force applied by Officer Barron in effecting Horn's arrest—a soft hands, straight arm bar takedown technique, by which he gained control of her by taking hold of her left arm, putting his right arm over her left arm, and using gravity and his own weight to bring her to the ground—was unnecessary, it was not unlawful. Horn was not restrained at the time the force was applied by Officer Barron. For that reason, the cases on which the

16

district court relied for its denial of summary judgment on qualified immunity are distinguishable from Horn's case.

In *Hadley*, for example, the suspect had already been securely handcuffed when the officers punched him in the stomach. 526 F.3d at 1327. In *Slicker v. Jackson*, 215 F.3d 1225 (11th Cir. 2000), the officers slammed the suspect's head into the pavement and kicked him repeatedly *after* he was handcuffed and not resisting. *Id.* In *Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002), an officer deployed pepper spray against a suspect who was already restrained in the back of a patrol car. *Id.* In *Fils*, the suspect raised his hands and took a step back from the officer when he saw the officer was pointing a taser at him. 647 F.3d at 1277. Two officers then tased him, and, after he was compliant and lying on the floor, one of them then grinded a contact taser into his neck. *Id.* And, finally, in *Popham v. City of Kennesaw*, 820 F.2d 1570 (11th Cir. 1987), the case that is the most factually similar to Horn's, the plaintiff was shoved to the floor by one officer when he pulled his arm away, tackled by another officer, and then, after he was on the floor, not fighting back, officers choked him, kneed him in the groin, yanked his legs, and bent back his wrists. *Id.*

All of these cases present instances of gratuitous and sadistic force used against compliant suspects. Here, however, Horn was not restrained and had,

17

undisputedly, pulled her arm away from Officer Barron. The force that Officer Barron used, therefore, was not gratuitous. For these reasons, none of the cases relied upon by the district court would put Officer Barron on notice that he could not use a soft hands, straight arm bar takedown technique to handcuff Horn when she admits she pulled her arm away from him.

The force used here by Officer Barron was no more severe than the force that we have described as *de minimis* and lawful in other materially similar cases. For example, in *Durruthy v. Pastor*, 351 F.3d 1080 (11th Cir. 2003), the plaintiff brought a claim of excessive force against a police officer who "force[d] [the plaintiff] down to the ground and plac[ed] him in handcuffs." *Id.* at 1094. We reversed the denial of qualified immunity because we concluded that the officer used only *de minimis* force to arrest the plaintiff. *Id.* In *Croom v. Balkwill*, 645 F.3d 1240 (11th Cir. 2011), the plaintiff brought a claim of excessive force against a deputy sheriff who forced the plaintiff to the ground from a squatting position and held her there with a foot (or knee) in the back for up to ten minutes. We affirmed the district court's grant of summary judgment in favor of the defendant on the basis that the force used against the plaintiff, even if unnecessary, was *de minimis*. *Id.* And, in *Myers v. Bowman*, 713 F.3d 1319 (11th Cir. 2013), the plaintiff brought a claim of excessive force against a deputy sheriff who "grabbed

18

[the plaintiff] by the arm, forced him to the ground, placed him in handcuffs" and "held [him] to the ground for less than one minute before he helped [him] to his feet." *Id.* at 1328. We affirmed the district court's grant of summary judgment in favor of the defendant because the force used against the plaintiff was *de minimis*. *Id.*

Here, Horn was admittedly "pissed off" and shouting obscenities about being removed from the concert. Although Horn's crime was not severe, a reasonable officer in Officer Barron's position could think she posed a threat to himself, other officers, and other concert-goers. Although Horn was not disobeying a lawful command when she admittedly pulled her arm away from Officer Barron, a reasonable officer confronted with these facts would still be entitled to think that she was resisting and posed a threat of resisting further, given her prior volatile and aggressive behavior. Police officers are often called upon to make split-second judgments "in circumstances that are tense, uncertain, and rapidly-evolving," and the typical arrest involves some force and injury. *See Kingsley*, ___ U.S. at ___, 135 S. Ct. at 2474 (2015) (quoting *Graham*, 490 U.S. at 397, 109 S. Ct. 1865). Therefore, Officer Barron was entitled to use some degree of force to put her in the handcuffing posture. Officer Barron used a minimal level of force—a soft hands, straight arm bar takedown technique—to do so. He did not use a weapon, he did

19

not hit, punch, or kick her, he did not have assistance from multiple officers, he did not "throw" Horn to the ground with intentional, or gratuitous, unwarranted force, nor did he use any force against her after she was on the ground. He did not use any force intended to cause injury; rather, Horn's injury was the unfortunate result of Officer Barron's reasonable use of force. In light of the foregoing, the district court's denial of Officer Barron's motion for summary judgment on the basis of qualified immunity is erroneous.

## III. CONCLUSION

Accordingly, we reverse the decision of the district court and remand with instructions to grant Defendant-Appellant William Barron's motion for summary judgment.

**REVERSED AND REMANDED**.

20