[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-15764
_____

D.C. Docket No. 4:14-cv-00260-HLM


JUSTIN HAMMETT,
as Administrator of the Estate of Daniel
Hammett,

Plaintiff - Appellant,

versus

PAULDING COUNTY, GEORGIA,
CITY OF DALLAS, GEORGIA,
NATHALIE D. WHITENER,
in her individual capacity,
JOEY HORSLEY,
in his individual capacity,
JOSEPH MAYFIELD,
in his individual capacity,

Defendants - Appellees,

GARY GULLEDGE,
in his individual capacity and his
capacity as Sheriff of Paulding County,
Georgia, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(November 17, 2017)

Before JULIE CARNES and BLACK, Circuit Judges, and WILLIAMS,[*] Judge.

BLACK, Circuit Judge:

On October 17, 2012, police officers Joey Horsley, Nathalie Whitener, and Joseph Mayfield, defendants-appellees in this case, executed a search warrant at a private residence in Hiram, Georgia, intending to seize methamphetamines suspected to be in the possession of Brenda Van Cleve.  During the execution of the warrant, a confrontation ensued.  Each of the officers fired one shot, two of which struck Daniel Hammett, Van Cleve's husband.  Hammett died from his injuries, and plaintiff-appellant Justin Hammett (Plaintiff) brought this suit on behalf of Hammett's estate.  The complaint alleges the officers used excessive force against Hammett in violation of the Fourth Amendment.  The district court granted summary judgment, determining the officers were entitled to qualified immunity.  Plaintiff appealed, and we affirm.

_____

[*] Honorable Kathleen M. Williams, United States District Judge for the Southern District of Florida, sitting by designation.

2

## I.  BACKGROUND

### A. *The Hammett Household*

At the time of his death, Daniel Hammett was married to Brenda Van Cleve. The two lived together in a house on Nebo Road with their son Clyde Dillon Hammett (Clyde), who was seventeen years old and in high school at the time of the incident.  Together, Hammett and Van Cleve lived on Hammett's disability benefits of $650–$700 per month, plus Hammett's earnings from occasional repossession work he did for his son, Justin Hammett.  Van Cleve was not otherwise employed.

The Nebo Road residence is a small, one-story, three-bedroom house.  A floor plan of the house and photos of the interior taken the day of the events giving rise to this suit are attached as an appendix to this opinion.[1]  Hammett and Van Cleve covered all the windows and the front door with sheets of plastic and blankets, which they affixed to the walls with packing tape.  *See* Appendix at 11–14, 16, 18–19.  They did not typically keep the lights on in the living room, kitchen, or hallway.  Because the front door was sealed with tape, the family used the carport door for entry and exit.  *See id.* at 3–5, 11, 14.  The carport door leads

---

[1] The photos in the Appendix, taken the day of the incident, were included among many others in a Georgia Bureau of Investigation report, as was a floorplan of the house.  The photos on pages 3 through 20 of the Appendix were verified by Clyde in his deposition as accurately and truthfully depicting the house as it existed on the day of the incident.  Clyde also verified the floorplan.  Van Cleve verified a smaller subset of the same group of photographs at her deposition.

into the kitchen and dining area, which is connected to the family room and from there the rest of the house by an archway. *See id.* at 1, 5–8, 12. The family hung a blanket in the archway for climate control purposes. *See id.* at 7–8. As a result of these measures, there was very little natural or artificial light in the interior of the house.

*B. Van Cleve's Drug Activity*

In October 2012, Van Cleve was addicted to methamphetamines. She had smoked meth regularly since the early 1990s, resulting in multiple convictions and various stints in prison. Van Cleve also frequently smoked marijuana. She was the only chronic drug user in the household. Hammett and Van Cleve used meth together in the mid-1990s and were incarcerated for doing so. Hammett had not used meth since, though at the time of his death he was taking oxycodone and other medications as directed by a doctor to treat his many health problems. Clyde stayed away from drugs entirely.

*C. The Search Warrant*

Van Cleve's meth use led to the events giving rise to this lawsuit. She was able to sustain her habit at no cost by having the drug "fronted" to her (i.e., receiving the meth without having to pay up front), selling a portion at a markup, and keeping the remainder for her own consumption. Van Cleve's drug activity eventually attracted the attention of law enforcement. Joey Horsley (Horsley), an

4

agent with the Paulding County Sheriff's Office assigned to the Haralson-Paulding Drug Task Force, received information over the course of the several months preceding the incident that Van Cleve was selling meth from the carport of the Nebo Road residence. Horsley recruited a confidential informant to make a controlled purchase from her. The informant did so, successfully obtaining forty dollars' worth of meth from Van Cleve, which was recorded on video. Horsley subsequently applied for a warrant to search the house and on October 16, 2012, he obtained it. Horsley expected Van Cleve was a small-time dealer but thought that he might be able to track down her supplier by searching the house.

*D. The Search*

The search took place on Wednesday, October 17, 2012. At around 2:15 p.m., Horsley briefed the search team at the Paulding County Sheriff's Office. He advised the agents and deputies that the target of the search was Van Cleve and that there was no intelligence as to whether firearms were present at the house. As they prepared to execute the search warrant, the officers met in the parking lot of a grocery store near the Nebo Road residence. Members of the search team donned tactical bullet-proof vests, each bearing the designation "SHERIFF" or "POLICE" in large letters on the front and back. Among the group of officers were Nathalie Whitener (Whitener) and Joseph Mayfield (Mayfield), defendants-appellees in this case. Whitener wore a vest similar to Horsley's, with identical identifying

5

markers, including the word "SHERIFF" emblazoned on the front and back in large letters. Officers Brian Rutherford (Rutherford), Mike Blackmon, Seth Cook, Scott Veal, and Jimmy Motes, none of whom are defendants in this case, accompanied Horsley, Whitener, and Mayfield to execute the search warrant. All of the officers wore police gear or uniforms easily identifying them as law enforcement. After the briefing, the officers drove to the Nebo Road residence in multiple marked and unmarked police cars and parked the vehicles in the driveway at around 3:15 p.m.

Horsley did not anticipate any violent resistance from Van Cleve and the warrant did not contain a no-knock clause, so he and the other officers approached the house in an unhurried manner. When Horsley reached the carport door, he began knocking and announcing "Sheriff's Office, search warrant" in a loud but non-yelling voice. *See* Appendix at 3, 5. The other officers, including Whitener, Mayfield, and Rutherford, lined up behind Horsley next to the door in a "stack" as Horsley repeatedly knocked and announced "Sheriff's Office," which continued for between fifteen and thirty seconds. No one inside the house answered.

Having received no response, Horsley tried the doorknob and found it was unlocked. He called out "Sheriff's Office" again through the open door and asked if anyone was home. Still no one answered, so Horsley entered, followed by the other officers. The police had their firearms drawn and in the low-ready position,

6

which is standard operating procedure in the execution of a search warrant in Paulding County.  On entering the residence, the officers found it was very dark because there were no lights on in the kitchen, living room, or hallway, and there was no natural light because all the windows were covered.[2]  The officers did not turn on any lights as they moved through the house.[3]  The officers continued to call out "Sheriff's Office, search warrant" as they moved through the house.  Still they received no answer.

The officers cleared the kitchen.  *See id.* at 5–7.  Horsley, followed by Whitener and Rutherford, moved through the blanket-covered opening into the living room.  *See id.* at 7–8 (showing the blanket on the floor and the doorway in which it hung during the search).  Horsley turned to the left toward a hallway leading to the home's bedrooms and bathroom.  He waited there facing the hallway for about five seconds, and again announced the officers' presence.  *See id.* at 9–10.  Whitener turned to the right to face the front door area, *see id.* at 11, 14, and Rutherford turned further to the right to inspect an area in the far right-hand corner of the living room, *see id.* at 13.  Horsley heard voices coming from down the hallway.

---

[2] Note that the pictures of the house in the Appendix were taken after the lights had been turned on.  Van Cleve testified that the lights were on in the bathroom and the computer room only at the time the warrant was executed.

[3] According to Whitener, police officers are trained not to turn lights on until after a building is secured because to do so would put the officers at risk by making them a target; instead, they are to use the flashlights attached to their pistols.

The events that transpired next are the focus of the present dispute.  In determining whether the officers were entitled to summary judgment, we must view the facts and make all reasonable inferences in the light most favorable to Plaintiff.  In order to determine whether a material dispute exists, we begin by recounting the relevant evidence from each of the pertinent sources in detail as it appears in the record.

*1. Testimony of principal witnesses*

*a. Horsley*

According to Horsley, as he stood facing the hallway, he could see a light coming from inside the computer room.  *See* Appendix at 9–10.  Watching the hallway, he saw a shadow emerge.  Horsley announced again that he was from the Paulding County Sheriff's Office.  A large man came out of the room and turned toward Horsley.[4]  The man, who turned out to be Hammett, stopped for a second and Horsley saw that his hands were tucked into his waistband area.  Horsley then saw him move something from his left hand to his right hand in a manner that concealed what he had.  The flashlight attached to Horsley's pistol was illuminated and he pointed it at Hammett's waistband, announcing "Sheriff's Office, let me see your hands" as he did so.  Horsley then decided he needed to get Hammett to the ground so the other officers could move through the hallway and secure the rest of

_____

[4] According to his autopsy report, Hammett weighed 241 pounds.

8

the house so that it could be searched. Hammett did not obey Horsley's command to raise his hands, however, and made no verbal reply. Instead, Hammett stepped suddenly toward Horsley, sliding his body against the wall to Horsley's left (Hammett's right) in an apparent attempt to move around him. As he approached, Horsley dropped his firearm slightly, took a small step toward Hammett, and reached out his left hand toward Hammett to begin to subdue him, but he did not touch Hammett. Hammett quickly moved his right hand toward the left side of Horsley's head. As he did so, Horsley caught a brief glimpse of a shiny black object in Hammett's hands. Horsley thought Hammett was ambushing him with a weapon, and he responded by raising his firearm and shooting toward Hammett. Hammett cried out loudly in response to being hit by Horsley's bullet. As Horsley fired, he lurched backward to avoid Hammett's attack and fell. While he was falling, he heard two more shots in rapid succession and he feared that Hammett was the shooter. All of the foregoing occurred in a matter of seconds. After hearing the shots, Horsley scrambled backward, yelled for the other officers to get out of the house, and quickly exited the residence.

### b. Whitener

The events unfolded in a similar manner in Whitener's telling. According to Whitener, as Horsley was looking down the hallway, Whitener was facing to the right into the living room. *See* Appendix at 11–14. Whitener heard Horsley say

9

"show me your hands" or "let me see your hands" and immediately turned to the

hallway to see what was happening.  As Whitener looked, she saw Hammett facing

in the direction of the officers, with his hands down near his waist as if to conceal

something, disobeying the command to show his hands.  Hammett said nothing in

response to Horsley.  Whitener also had a flashlight attached to her pistol, which

she pointed at Hammett, attempting to determine what Hammett was carrying.

After being ordered to do so again, Hammett still did not show his hands.  Instead,

in Whitener's words, Hammett "stepped over towards the right side of the hall and

just started walking at us at a fast pace," still "not showing his hands," and "like

hugging, basically hugging the wall."  Whitener observed Horsley attempt to grab

Hammett, and then saw Hammett suddenly reach up with his hands toward

Horsley's face in an aggressive manner.  She then heard a gunshot and saw

Horsley lurch backward and begin to fall.  Whitener immediately fired her weapon

toward Hammett, who she feared was attempting to harm Horsley and had possibly

shot him.  As she fired, Hammett twisted to his right and it appeared to her that the

shot hit him in the lower left side of his back.  Whitener expressed some

uncertainty in her deposition as to whether she or Horsley shot first and whether it

was her bullet or Horsley's that struck Hammett's torso.  However, she was clear

that the shots were nearly simultaneous, within a second or a half-second of one

another.  As Horsley began yelling for the officers to get out of the house,

10

Whitener fell backward into the living room and hid behind the couch near the front door. *See id.* at 14. She did not exit the residence, but remained hidden, listening to whispers between the remaining occupants and fearing for her life. Later, when the house was secured, Whitener was able to leave the building.

### c. Rutherford

Rutherford, who is not a defendant in this case, provided the only other eyewitness account. According to Rutherford, as the officers entered the living room, he already had the flashlight on his firearm activated because it was dark and he could not see. He turned to the right toward the corner of the house, toward the end of the couch where a pile of clutter lay. *See* Appendix at 13. He thought the area was large enough for someone to be hiding there, based on the way the shadows were cast. Rutherford then heard Horsley say "show me your hands" or "let me see your hands." Shortly thereafter, Rutherford heard a gunshot. Rutherford pivoted to his left and his flashlight illuminated the words "SHERIFF" on the back of a tactical vest. He then heard another shot and saw a flash in front of the officer wearing the vest. After he heard that shot, the person wearing the vest—Rutherford did not yet recognize which officer it was—fell to the ground.[5] As he looked to the ground, Rutherford recognized the officer was Horsley. He

---

[5] Deputy Jimmy Motes was not deposed, but his supplemental incident report indicates that he entered the living room and immediately heard two shots, then turned and saw Horsley falling backward. This is consistent with Rutherford's testimony and Plaintiff's contention that both shots were fired before Horsley had fallen completely.

thought Horsley was hurt.  He grabbed Horsley and helped him exit the building.

Rutherford testified that the only officer he saw was Horsley; he did not know

where Whitener was at the time.  After reaching down to help pick up Horsley,

Horsley told him to get out, and Rutherford exited the building.

### d. Van Cleve

Van Cleve was at home and admits she was under the influence of meth

when the officers arrived.[6]  She usually smoked meth and marijuana in the

computer room, which is where she was when Hammett came home earlier that

afternoon.  *See* Appendix at 1 (showing the computer room as "Bedroom #2," the

first door in the hall on the right); *id.* at 10, 16 (photographs of the hallway and

computer room).  Van Cleve and Hammett were sitting in the computer room

talking when they heard the officers announce "Paulding County Sheriff's Office,

search warrant."  The announcement sounded as if it came from the carport area.[7]

Van Cleve and Hammett sat in the computer room for thirty seconds or so trying to

figure out what to do.  Then, Hammett got up and went out into the hallway while

Van Cleve dashed straight across the corridor to the bathroom, intending to flush

her meth down the toilet.  She heard a male voice say "show me your hands" and

---

[6] Though she did not specifically remember doing so, she also agreed she had possibly used cannabis that day as well, since a pipe containing half-smoked marijuana was found in the computer room.

[7] In her deposition, Van Cleve does not recall how many times she heard the police announce their presence.

"put your hands in the air."  Van Cleve's deposition testimony is confusing, perhaps because, as she admits, she was under the influence of methamphetamines when the shooting occurred.[8]  It is clear, however, she agrees a total of three shots were fired within the span of a few seconds.  Van Cleve froze when she heard the first shot, failing to dispose of her drugs.

When the officers exited the building, Van Cleve ran back and forth between the bathroom and the computer room in a state of shock.  She was still carrying her meth when she was placed in a patrol car outside, but she was able to free her hands and swallow the drug while she was in the police car so that it would not be found.

Van Cleve's testimony shed little light on what Hammett may have had in his hands when he left the computer room.  In an interview conducted the day of the incident, of which the record contains only a summary, Van Cleve stated that Hammett was holding a clipboard when he left the computer room.  At her deposition, however, she was unable to recall whether Hammett had anything in his hands, speculating that he may still have been carrying paperwork with which he had entered the room.  When shown a picture of a bottle of pepper spray found in the hallway after the shooting, Van Cleve neither confirmed nor denied it was

---

[8] Van Cleve expressed a good deal of uncertainty as well as the inability to recollect many of the specifics of the incident, remarking that she "spent three years trying to forget that day."

Hammett's. *See id.* at 20.  She acknowledged Hammett owned pepper spray but she was not sure if he had it in his hands when he went out into the hallway, and she did not remember seeing the pepper spray in the hallway after the shooting.

> ### e. Clyde

At the time of the shooting, Clyde was in his bedroom at the end of the hallway playing video games with headphones on one ear and his bedroom door shut.  *See* Appendix at 1 (showing Clyde's room as "Bedroom #3"); *id.* at 10, 17, 19 (photographs of the hallway, the end of the hallway, and Clyde's room).  He had come home from school about forty-five minutes earlier and gone straight into his room and closed the door.  Clyde did not hear his father arrive at the house, nor did he hear any police pull up.  While he was playing, he heard a male voice yell "Sheriff's Office."  Clyde threw off his headphones, and then later heard a voice say "show me your hands."  Then he heard two gunshots "one right after another," within a second or two of each other.  He did not hear Hammett, Van Cleve, or anyone else say anything during this time period.  After hearing the shots, Clyde opened his door and went out into the hallway.  He saw Hammett lying against the wall in the hallway next to the computer room about midway between the door opening and the corner of the living room, with his legs toward the living room and his head toward the bedrooms.  *See id.* at 10 (showing a bloodstain on the right wall of the hallway).  Clyde did not see anything in his father's hands.  Hammett

14

was not able to say anything to Clyde. Clyde saw blood coming from his father's shirt, so he knew he had been shot. At that point, because he was scared, Clyde returned to his bedroom. He later emerged at the command of a police officer, and was briefly placed into custody.

Clyde confirmed that Hammett usually carried a can of pepper spray for use in his repossession work and that he would keep the pepper spray in his pocket. He also agreed that the can of pepper spray shown in the incident photographs was Hammett's and that it was found by Hammett's body, though he did not see it there when he first went into the hallway. *See id.* at 20.

### 2. Other evidence

#### a. Facts pertaining to Mayfield

The parties agree the single shot Mayfield fired did not strike Hammett and was discharged after Hammett had already been hit by the first two bullets. Mayfield was part of the search team and entered the kitchen from the carport behind Horsley and Whitener. As Mayfield followed Horsley and Whitener into the building, Mayfield got "hung up" in the doorway between the kitchen and the living room, in which a blanket was hanging. *See* Appendix at 7–8 (showing the blanket on the floor and the doorway in which it was hung). Mayfield heard two gunshots and then turned and saw Horsley fall to the ground. He believed Horsley had been hit. After he heard the shots fired, he discharged one round from the

15

kitchen in the general direction of the perceived threat, though he did not see Hammett and did not know who had fired the two shots. His bullet was never recovered, though there is some evidence that it may have actually struck the back of Whitener's bullet-proof vest.

### b. The autopsy report

Hammett's autopsy report shows that although shorter than average, Hammett was a large man. He stood five feet six inches tall and weighed 241 pounds. The report describes two wounds. The fatal wound was a gunshot to the torso. The wound of entrance was found on the back-left side of the torso, eight centimeters to the left of the midline and fifty-three centimeters from the top of the head. The bullet followed a left-to-right, back-to-front and slightly downward direction through Hammett's torso. The projectile did not exit the body, but caused a bruise on Hammett's abdomen three centimeters to the right of the midline and fifty-eight centimeters from the top of the head. The second wound was a grazing laceration on the lateral aspect of the left index finger, also caused by a bullet.

### c. Certain material facts on which the parties agree

The parties agree that three shots were fired: one by Horsley, one by Whitener, and one by Mayfield. All agree Mayfield's shot was the last of the three and did not strike Hammett. The parties also agree the first shot grazed Hammett's

16

left index finger and lodged in the wall next to the bathroom door frame fifty-two inches above the floor. *See* Appendix at 21. Nor is there any dispute that the second shot entered the back-left side of Hammett's torso and killed him.[9]

*E. Procedural History*

Plaintiff brought this suit as the administrator of Hammett's estate against Horsley, Whitener, and Mayfield, as well as Paulding County and the City of Dallas, Georgia, and certain other defendants. He alleged violations of the Fourth Amendment and asserted state law tort claims. The district court granted summary judgment to the defendants on all claims. The court determined the actions of Horsley and Whitener were objectively reasonable in light of the circumstances and therefore granted qualified immunity. It also determined that Mayfield was entitled to summary judgment because his bullet did not strike Hammett, so Mayfield did not seize Hammett within the meaning of the Fourth Amendment. The court did not address whether the law was clearly established in either case because it found no violations in the first place. Plaintiff appeals the judgment of the district court only with respect to his Fourth Amendment excessive force claims against Horsley, Whitener, and Mayfield, contending the district court erred in granting qualified immunity.

---

[9] The ballistics report was inconclusive as to which gun fired the bullet that struck Hammett in the back.

17

## II. STANDARD OF REVIEW

We review the district court's grant of qualified immunity to Horsley, Whitener, and Mayfield de novo. *Dukes v. Deaton*, 852 F.3d 1035, 1041 (11th Cir. 2017), *petition for cert. filed*, 85 U.S.L.W. 3543 (U.S. Apr. 26, 2017) (No. 16-1299).

## III. DISCUSSION

### A. Qualified Immunity Generally

The Supreme Court has long held that government officials are entitled to a form of immunity from civil suits for damages. *See Nixon v. Fitzgerald*, 457 U.S. 731, 744, 102 S. Ct. 2690, 2698 (1982). It has often recognized that immunity, whether qualified or absolute, is rooted in the long tradition of the common law. *See Harlow v. Fitzgerald*, 457 U.S. 800, 806, 102 S. Ct. 2727, 2732 (1982); *Nixon*, 457 U.S. at 744, 102 S. Ct. at 2698; *see also Spalding v. Vilas*, 161 U.S. 483, 494, 16 S. Ct. 631, 635–36 (1896). As the Court recently explained,

> At common law, government actors were afforded certain protections from liability, based on the reasoning that "the public good can best be secured by allowing officers charged with the duty of deciding upon the rights of others, to act upon their own free, unbiased convictions, uninfluenced by any apprehensions."

*Filarsky v. Delia*, 566 U.S. 377, 383, 132 S. Ct. 1657, 1661–62 (2012) (quoting *Wasson v. Mitchell*, 18 Iowa 153, 155–56 (1864)). The same considerations of the public good that motivated common law protections have driven the development

18

of official immunity even as it has evolved beyond the contours of the common law. *See Spalding*, 161 U.S. at 498, 16 S. Ct. at 637 ("It would seriously cripple the proper and effective administration of public affairs as intrusted to the executive branch of the government, if he were subjected to any such restraint [as a civil suit for damages]."); *Anderson v. Creighton*, 483 U.S. 635, 644–45, 107 S. Ct. 3034, 3041–42 (1987) ("Although it is true that we have observed that our determinations as to the scope of official immunity are made in the light of the common-law tradition, we have never suggested that the precise contours of official immunity can and should be slavishly derived from the often arcane rules of the common law." (citation and quotation omitted)).

The prudential judgment embodied in qualified immunity represents a "balance between . . . evils" in the protection of the citizenry. *Harlow*, 457 U.S. at 813, 102 S. Ct. at 2736. On the one hand, permitting injured citizens to sue for damages "may offer the only realistic avenue for vindication of constitutional guarantees." *Id.* On the other, it is essential that the law protect public officials so that they can "carry out their discretionary duties without the fear of personal liability or harassing litigation." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). The satisfaction of individual grievances must be balanced against the societal harm that would result from allowing lawsuits to proceed against public servants unchecked. In service of this end, the doctrine permits officials to

19

faithfully perform their duties without being second-guessed.  It "recognizes the problems that government officials like police officers face in performing their jobs in dynamic and sometimes perilous situations."  *Merricks v. Adkisson*, 785 F.3d 553, 558 (11th Cir. 2015).  The individual benefit to an officer is both prospective and retrospective.  Before any alleged civil rights violation occurs, a police officer is free to address the needs of situations as they arise in the course of his duties unfettered by excessive liability concerns.  If, however, the official has been involved in an incident that could give rise to liability, qualified immunity ensures only meritorious claims will proceed to trial so that the officer can continue to serve the public unimpeded.  This is an important virtue of a robust qualified immunity standard because "a pending civil rights lawsuit is a sword of Damocles . . . seriously impeding the official in the performance of his duties."  *Green v. Brantley*, 941 F.2d 1146, 1150 (11th Cir. 1991) (en banc).  "Avoidance of distraction to public officials [is] one of the main purposes of the qualified immunity doctrine."  *Id.*

So strong is the public interest in protecting government officials in the reasonable discharge of their duties that such officials are insulated not only from damages, but even from the costs of going to trial; for this reason, in most instances interlocutory appeal of district court decisions denying qualified immunity is permitted.  *See Siegert v. Gilley*, 500 U.S. 226, 232, 111 S. Ct. 1789,

20

1793 (1991) ("One of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit."); *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815 (1985) ("[Qualified immunity] is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."). Indeed, in *Harlow v. Fitzgerald*, the Supreme Court refashioned the qualified immunity standard with the express intention of reducing the number of suits that would go to trial; it did so by ceasing to inquire as to the officer's subjective state of mind and instead measuring the conduct against an objective reasonableness standard. *Harlow*, 457 U.S. at 815–16, 102 S. Ct. at 2737 ("The subjective element of the good-faith defense frequently has proved incompatible with our admonition . . . that insubstantial claims should not proceed to trial."); *cf. Merricks*, 785 F.3d at 558 ("[Qualified immunity] is also designed . . . to provide a direct way to end insubstantial claims on summary judgment.").

Although these safeguards work to the benefit of individual officers, they exist for the sole purpose of protecting the public at large. Indeed, suits against officials "frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to society as a whole." *Harlow*, 457 U.S. at 814, 102 S. Ct. at 2736.

21

These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office.  Finally, there is the danger that fear of being sued will "dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties."

*Id.* (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)).  In sum, a balance must be struck between the harm to individuals aggrieved by official misconduct and the harm to society resulting from a shackled executive apparatus.  Qualified immunity is the path the courts have chosen.

## B. Excessive Force

The origins and purposes of qualified immunity remind us that although the circumstances of a case may be singularly unfortunate, regrettable facts do not automatically spell personal liability for police officers.  We are bound to apply the reasonableness standard set forth by the Supreme Court and this Court.

In the present litigation, there is no dispute the officers' conduct was discretionary, so Plaintiff must show the officers violated Hammett's constitutional right and that the right was clearly established at the time.  *See Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016).  We need not address the question of clearly established law because Plaintiff has not shown a constitutional right was violated.  Thus qualified immunity turns on whether the officers used excessive force, as alleged.

22

"Any claim that a law enforcement officer used excessive force—whether deadly or not—during a seizure of a free citizen must be analyzed under the Fourth Amendment's 'reasonableness' standard." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009) (citing *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989)). Determining whether the force used is reasonable "requires balancing of the individual's Fourth Amendment interests against the relevant government interests." *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (citing *Graham*, 490 U.S. at 396, 109 S. Ct. at 1871). "The operative question in excessive force cases is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure.'" *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9, 105 S. Ct. 1694, 1700 (1985)). As the Supreme Court recently summarized,

> The reasonableness of the use of force is evaluated under an objective inquiry that pays careful attention to the facts and circumstances of each particular case. And the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred. That inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim.

*Id.* at 1546–47 (citations and quotations omitted). Reasonableness is the touchstone for all excessive force claims, regardless of whether the force used was deadly. *See Garczynski*, 573 F.3d at 1166. "As to deadly force, a police officer

23

may use such force to dispel a threat of serious physical harm to either the officer or others, or to prevent the escape of a suspect who threatens this harm." *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015). "We have held that it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has 'probable cause to believe that his own life is in peril.'" *Id.* (quoting *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005)); *see also Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013) ("In the deadly force context, we have observed that a police officer may constitutionally use deadly force when the officer . . . has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others . . . ." (quotation omitted)).

### 1. Horsley and Whitener

Plaintiff's sole argument with respect to Horsley and Whitener, repeated in various forms throughout his brief, is that based on the physical evidence and testimony taken in the light most favorable to Plaintiff, a jury could reasonably find that Horsley and Whitener fired on Hammett without justification when he was not a threat to them. In order to sustain this contention, Plaintiff asserts a jury could find the following facts. First, Hammett raised his hands in surrender when Horsley told him to do so. At that moment, Whitener fired without justification, her bullet grazing Hammett's left index finger. Wounded and terrified, Hammett

24

turned in full retreat, at which point Horsley shot Hammett in the back in cold blood.  Plaintiff insists that the evidence supports this story.  In rejecting it, he contends, the district court resolved questions of material fact in favor of the officers.

If the evidence could legitimately be interpreted as Plaintiff insists it can, the officers' use of force might have been excessive.  Plaintiff's arguments fail, however, because no reasonable jury could make out his theory on the evidence in the record.  Plaintiff's attempts to show otherwise stretch the summary judgment standard far beyond its breaking point.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  "A genuine dispute requires more than 'some metaphysical doubt as to the material facts.'"  *Garczynski*, 573 F.3d at 1165 (quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007)).  The fact that the record contains anything at all in support of the nonmovant's position is not dispositive; a "genuine" dispute requires that the evidence is such that a reasonable jury could find for the nonmovant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

25

must be evidence on which the jury could reasonably find for the plaintiff."). Although all reasonable inferences are to be drawn in favor of the nonmoving party, "an inference based on speculation and conjecture is not reasonable." *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (quotation omitted).

The Supreme Court has instructed that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380, 127 S. Ct. at 1776. In this case, voluminous uncontradicted evidence stands completely at odds with Plaintiff's theory of surrender and retreat. Taking all facts and making all reasonable inferences in the light most favorable to Plaintiff, the following facts remain undisputed. The officers knocked and announced before entering the residence but no one responded. Then, while moving through the house, they continually announced their identity and their purpose, still to no response. Clyde confirmed he heard the police identify themselves. In addition, Van Cleve testified and it is undisputed that she and Hammett heard the police announce themselves and remained in the computer room for some time trying to decide what to do. The officers moved through the house, which was very dark even at the height of the afternoon because there were no lights on and all of the

26

windows were covered with opaque materials. When Hammett came out of the computer room, Horsley clearly and audibly ordered him to show his hands. This, too, was confirmed by Van Cleve. Both officer eyewitnesses testified Hammett refused to comply, and there is no evidence to suggest otherwise—Van Cleve did not hear Hammett say anything in response to Horsley to indicate submission, nor did Clyde or any of the other officers. Instead, Hammett aggressively approached Horsley with an unidentified object in his hands, which he moved toward Horsley's face. Whether the object ultimately turned out to be Hammett's clipboard or his pepper spray is immaterial; in the tense and uncertain moments leading up to the shooting, a reasonable officer could have believed it to be a weapon, especially given dim lighting and the way Hammett handled it. Horsley and Whitener fired in response, and regardless of who shot first, the sounds of the gunshots occurred in rapid succession. Finally, the bullet that killed Hammett entered the back-left side of his torso and caused a bruise on the right side of his stomach, traveling diagonally through his body.

None of these critical facts is disputed by affirmative evidence. Several are inconsistent with the surrender-and-retreat theory, most obviously, the officers' testimony that Hammett charged at Horsley. In addition, the two shots that struck Hammett occurred in rapid succession, which would not leave time for a retreat in the split second between them. Furthermore, if Hammett were retreating back

27

down the hallway when he was shot, the bullet would have traveled straight through him, not diagonally from left to right, which would have been impossible. "Though factual inferences are made in [Plaintiff's] favor, this rule applies only '*to the extent supportable by the record*,'" *Penley v. Eslinger*, 605 F.3d 843, 853 (11th Cir. 2010) (quoting *Scott,* 550 U.S. at 381 n.8, 127 S. Ct. at 1776 n.8), and Plaintiff's theory cannot be reconciled with it.

Even if we were to set the undisputed contradictory evidence aside, the mere fact that the record, when viewed in the light most favorable to Plaintiff, is theoretically not inconsistent with his narrative, is not enough to survive summary judgment. Holding all of the contrary (and uncontradicted) evidence aside, Plaintiff has not pointed to any affirmative evidence that Hammett surrendered and retreated.[10] *See Anderson*, 477 U.S. at 257, 106 S. Ct. at 2514 ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."). The assertion that he did is pure speculation. *See Ave. CLO Fund*, 723 F.3d at 1294. The bullet hole in the wall and the location of Hammett's wounds, by themselves, tell us essentially nothing about what happened. There are infinite possible permutations that would explain how the

---

[10] The tragedy of Hammett's death is doubly regrettable insofar as he is unavailable to testify on his own behalf. Nevertheless, as a result, evidence sufficient to defeat a motion for summary judgment must come from other sources. Here, we have the benefit of the testimony of Hammett's wife and son, who were both present at the time of the incident. Still, neither of them testified to anything that would challenge the officers' version of the facts. In the end, Hammett's misfortune does nothing to change the fact that no jury could reasonably find for Plaintiff on this evidence.

28

bullets ended up where they did during the brief and chaotic scuffle that occurred. Plaintiff is required to point to evidence that would support his theory, but he cannot. Instead, all of the available evidence refutes it.

Indeed, the undisputed facts show the officers did not act unreasonably. *Singletary*, 804 F.3d at 1181; *Garczynski*, 573 F.3d at 1166. "In excessive force cases, we are mindful that officers make split-second decisions in tough and tense situations," *Morton*, 707 F.3d at 1281, and that "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Mendez*, 137 S. Ct. at 1546 (quotation omitted). From this perspective, the facts show the following. The officers entered a dark and cluttered house after knocking and announcing for some time. As they moved through the building, they continually announced they were from the Sheriff's Office and they were executing a warrant, to no response. All of the sudden, a large man appeared in the hallway, saying nothing to the officers and giving no indication that he intended to cooperate even though the officers knew that he must have heard their announcements. Instead, he refused to obey their commands to show his hands, shifted an object between his hands, and rapidly approached them, drawing the object up toward the face of the lead officer. In the darkness, given the foregoing circumstances, the officers had probable cause

to believe it was a weapon and that Hammett intended to use it.[11] *See Perez*, 809

F.3d at 1220 (holding that "the presence or absence of a weapon is a factor in this

[excessive force] analysis," though the inquiry must nevertheless consider the

totality of the circumstances); *Penley*, 605 F.3d at 853 (holding that an officer had

"probable cause to believe his own life was in peril" where the suspect "was not

responding to the negotiator's questions; he did not comply with commands to

drop his weapon; and he pointed his weapon" at the police (quotation omitted)).  It

was not unreasonable of them to believe Hammett posed a threat of serious

physical harm and to respond accordingly.  *Singletary*, 804 F.3d at 1181.  We are

"loath to second-guess decisions made by police officers in the field," *Penley*, 605

F.3d at 854 (quotation omitted), and we will not do so here.

Though we acknowledge the present inquiry requires us to "slosh our way

through the factbound morass of 'reasonableness,'" *Scott*, 550 U.S. at 383, 127 S.

Ct. at 1778, such that each case will be somewhat unique, there are valuable

lessons to be gleaned from our prior decisions, in particular, that of *Garczynski v.

Bradshaw*.  There, during an encounter with his estranged wife, John Garczynski

---

[11] Although we hold Horsley and Whitener had actual probable cause, they could prevail even if they did not, for "an officer need only have arguable probable cause, not actual probable cause, in order to qualify for immunity from a Fourth Amendment claim." *Garczynski*, 573 F.3d at 1167.  That is, if the officer "reasonably could have believed that probable cause existed, in light of the information the officer possessed," then the officer did not commit a constitutional violation.  *Id.* (quoting *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997)).  As we have often recognized, "the qualified immunity standard is broad enough to cover some mistaken judgment."  *Id.*

manifested an intent to kill himself, and then disappeared. *Garczynski*, 573 F.3d at 1161. Reaching him on the phone, his wife learned he had a gun with him and planned to commit suicide. Garczynski's wife contacted the police and she stayed on the line with Garczynski trying to calm him down. *Id.* By triangulating the cell phone call, the police found Garczynski's car. *Id.* at 1162. Unbeknownst to the officers at the scene, at the direction of a police officer accompanying her, Garczynski's wife instructed him to start the car. *Id.* at 1163. The police, however, had orders not to let Garczynski leave. *Id.* Believing Garczynski's departure would create a dangerous situation, the officers ran to the car, banged on the windows, and tried to open the passenger door, attempting to get Garczynski out. Garczynski raised his gun, which the officers ordered him to drop. *Id.* Garczynski disobeyed the command, instead swinging the gun around toward one of the officers, at which point the police shot and killed him. *Id.* at 1164.

The case has parallels to this one. There, as here, "the escalation into deadly force was justified by [the decedent's] refusal to comply with the officers' commands." *Id.* at 1168. Much as Horsley did in this case, in *Garczynski*, "[a]fter identifying themselves, the officers repeatedly ordered Garczynski to show his hands." *Id.*

> Instead of obeying these commands, Garczynski swung the gun from his head in the direction of the officers, at which point they fired. The officers reasonably reacted to what they perceived as an immediate threat of serious harm to themselves. This is exactly the type of

31

"tense, uncertain and rapidly evolving" crisis envisioned by the Supreme Court. Judged from the perspective of a reasonable officer on the scene, the officers' use of deadly force was objectively reasonable under the circumstances.

*Id.* (citation omitted). The same reasoning applies in the present analogous, though obviously not identical, situation. The undisputed testimony establishes that, like Garczynski, Hammett was carrying something and disobeyed an officer's instruction to show his hands. After refusing to show his hands, Hammett moved aggressively toward Horsley and raised his hands rapidly toward Horsley's face. "Non-compliance of this sort supports the conclusion that use of deadly force was reasonable." *Penley*, 506 F.3d at 851. We acknowledge that here, unlike *Garczynski*, it turned out that Hammett was not armed with a deadly weapon. Nevertheless, we must view the situation from the perspective of a reasonable officer in Horsley's and Whitener's position. *See Mendez*, 137 s. Ct. at 1546. From that vantage point, after the officers repeatedly announced their presence to no response in a dark house occupied by a known meth dealer, Hammett's actions easily could have appeared to be an ambush. Under these circumstances, Horsley and Whitener had probable cause to believe Hammett posed a threat of serious physical harm to Horsley.

Plaintiff, relying in large part on the testimony of Rutherford, makes much of the possibility that Whitener shot first, and insists that on the facts most favorable to him, we must assume that she did. Plaintiff contends Whitener's

32

justification for shooting was simply that she heard a gunshot and thought Horsley had been hit.  Thus if in reality she discharged her weapon first, Plaintiff asserts, her theory of justification "goes out the window."  Brief of Appellant at 33.  To the contrary, however, Whitener says she fired because Hammett was moving aggressively toward Horsley, not merely because she heard a gunshot.  Indeed, she claims the entire sequence of events took place so quickly that she is not sure who shot first.  Although Whitener conceded in her deposition that she theoretically could have shot first, fairly read, all of her testimony indicates she thinks she discharged the second shot.  Similarly, there is nothing about the fact that Horsley may have shot second that undermines his claim that he shot because Hammett charged at him.  There is still no evidence that Hammett was submitting and retreating when he was shot, and nothing to create a dispute of material fact.  *See Garczynski*, 573 F.3d at 1165 ("A genuine dispute requires more than some metaphysical doubt as to the material facts.  A mere scintilla of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment." (citation and quotation omitted)).  Rather, the evidence shows the events took place quickly and chaotically.

In addition, Plaintiff makes much of some alleged inconsistencies between Horsley's and Whitener's initial statements to the Georgia Bureau of Investigation, their depositions taken during discovery, and their sworn declarations attached to

their motion for summary judgment.  We have difficulty identifying such discrepancies and fail to see how they would be material in any case.  But even assuming Horsley and Whitener provided inconsistent testimony at various stages of the proceedings, the Supreme Court has stated that "discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion." *Anderson*, 477 U.S. at 256–57, 106 S. Ct. at 2514 (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S. Ct. 1949, 1966, (1984)).  Rather, the plaintiff must present affirmative evidence.  *Id.* at 257, 106 S. Ct. at 2514.  Plaintiff has not done so.

"With the plaintiff's best case in hand, the court is able to move to the question of whether the defendant committed the constitutional violation alleged in the complaint without having to assess any facts in dispute."  *Robinson*, 415 F.3d at 1257.  The problem for Plaintiff is his best case does not involve Hammett surrendering and retreating.  The facts taken in the light most favorable to him simply do not support it.  Even where the alleged conduct would violate clearly established law, "the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts."  *Mitchell*, 472 U.S. at 526, 105 S. Ct. at 2815.  Plaintiff has failed to uncover evidence sufficient to create a factual dispute as to whether the officers shot Hammett without justification.

34

2. *Mayfield*

Mayfield was entitled to qualified immunity as well. As noted above, there is no dispute that Mayfield fired the third shot and that his bullet did not strike Hammett. The parties argue over the proper interpretation of two Sixth Circuit cases in attempting to determine whether Mayfield seized Hammett within the meaning of the Fourth Amendment. *See Floyd v. City of Detroit*, 518 F.3d 398 (6th Cir. 2008); *Cameron v. City of Pontiac*, 813 F.2d 782 (6th Cir. 1987). If Mayfield did not seize Hammett, it is argued, he cannot be liable for using excessive force. The parties neglect, however, *this* Circuit's law on the subject, which is sufficient to dispose of the issue.

We held in *Carr v. Tatangelo* that where police officers fire on an individual in alleged self-defense, but do not hit him or otherwise touch him, the individual has not been seized. 338 F.3d 1259, 1270–71 (11th Cir. 2003). In that case, an informant led police officers to a house suspected to be occupied by drug dealers. *Id.* at 1263. The informant was supposed to "have somebody come out with drugs for the officers to arrest," but instead he entered the house and was not seen again. *Id.* As the officers lay in wait for him to reemerge, they hid behind bushes and trees to conceal their presence. Plaintiffs Romeo Carr and Cedrick Wymbs exited the house and Wymbs noticed movement in the bushes and the two began throwing rocks at the area where the officers were hiding, suspicious that there were

35

individuals concealed there, as indeed there were. *Id.* The officers claimed that they heard someone chamber a bullet in a gun, so they opened fire on the two individuals. *Id.* at 1264–65. Their bullets struck only Carr, at which point both Carr and Wymbs fled into the house. *Id.* at 1265.

Both individuals sued the police officers. *Id.* at 1266. We held that Wymbs was not seized "[b]ecause [he] was not shot or physically touched by the officers." *Id.* at 1270–71. As such, he did not have a claim for excessive force under the Fourth Amendment. Rather, Wymbs' claim was properly analyzed as a Fourteenth Amendment substantive due process claim. *Id.* To prevail on that cause of action, a plaintiff is required to show an "executive abuse of power" that "shocks the conscience." *Id.* at 1271 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S. Ct. 1708, 1717 (1998)). Though ultimately we employed a reasonableness analysis "[s]imilar to the standard used to evaluate Fourth Amendment excessive force claims," *id.* (quoting *Jones v. City of Dothan*, 121 F.3d 1456, 1461 (11th Cir. 1997) (per curiam)), Wymbs bore "a higher burden to show a violation of substantive due process under the Fourteenth Amendment," *id.* at 1272. We held Wymbs had not met it and granted qualified immunity on his claims. *Id.* at 1273–74.

Plaintiff has not recognized, much less attempted to meet, this heightened burden with respect to Mayfield, and in any event he could not. Mayfield thought

36

his fellow officers were under fire, having heard first Horsley's commands that Hammett show his hands, without any response indicating submission, and then two quick bursts of gunfire. A reasonable officer in the situation would have probable cause to believe that the lives of his fellow policemen were in danger. There is no need to resort to foreign case law to find that Mayfield is entitled to qualified immunity.

## IV. CONCLUSION

Hammett's death is undoubtedly tragic. However, qualified immunity exists to protect public servants in precisely these circumstances. After discovery, Plaintiff has produced no evidence that suggests the "split-second judgments" of Horsley, Whitener, or Mayfield violated the Fourth Amendment as they responded to the "tense, uncertain, and rapidly evolving" events of that day. *Graham*, 490 U.S. at 397, 109 S. Ct. at 1872. Summary judgment was appropriate, and they are to be spared the burden of defending themselves at trial. The judgment of the district court is

**AFFIRMED.**

WILLIAMS, District Judge, Dissenting in Part:

On October 17, 2012, the police entered Brenda Van Cleve's home to execute a search warrant. The officers were informed during the pre-execution briefing that there were no known weapons or threats within the residence. Once inside, Officers Rutherford, Horsley, and Whitener proceeded to the living room, where they encountered Van Cleve's husband, Daniel Hammett. Fifteen to thirty seconds later, Hammett—who was unarmed and not the subject of the search warrant or a target in the underlying investigation—was dead, shot once in the hand and then fatally in the back. Those are the undisputed facts of this case.[1] The question before the Court is whether the Defendant Officers'[2] decision to use deadly force was objectively reasonable based on the circumstances of this case, when the evidence available is viewed in the light most favorable to the Plaintiff. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[i]n conducting *de*

---

[1] Although the majority includes a 16-page summary of some of the testimony given in this case, the section entitled "Certain material facts on which the Parties agree" is a mere four sentences long, and relates only to the number of shots fired and the trajectory of the bullets from those shots.

[2] Though I dissent with regard to the grant of summary judgment on Hammett's fourth-amendment claims against officers Whitener and Horsley, I agree with the majority that the district court should be affirmed as to Hammett's claims against Officer Mayfield. The facts regarding Mayfield's conduct are troubling—particularly his own testimony that he heard gunshots and then blindly discharged his weapon in a dark house where methamphetamine was being sold and the fact that, by all indications, his bullet struck Officer Whitener—but there is no evidence that the bullet he fired struck Hammett, or that his actions otherwise contributed to Hammett's death. Therefore Hammett's claims against Mayfield fail as a matter of law.

*novo* review of the district court's disposition of a summary judgment motion based on qualified immunity, we are required to resolve all issues of material fact in favor of the plaintiff."); *Thornton v. City of Macon,* 132 F.3d 1395, 1397 (11th Cir.1998) (After taking the facts in the light most favorable to Plaintiff "[w]e . . . answer the legal question of whether the defendant[ ][is] entitled to qualified immunity under that version of the facts.").

The evidence in this case does not conclusively establish what took place in the moments leading up to the shooting of Hammett.[3]  But Plaintiff argues that, under the most favorable interpretation of the evidence presented, a reasonable jury could make the following findings that would defeat summary judgment.  I agree.

## Disputed Issues of Material Fact

### A. *The Manner in Which Hammett Approached The Officers*

First, a jury could find that Hammett did not pose an immediate threat that would justify the use of deadly force as he approached the officers.  Officer Horsley testified that when the officers entered the living room and announced their presence, Hammett exited one of the bedrooms, "walk[ed] out in the hall and stopped for a second."  He then started walking down the hallway quickly toward the officers.  Specifically, Horsley recalled that "[i]t appeared that he was trying,

---

[3] The order entered by the district court below acknowledges in multiple footnotes that there may be material issues of fact remaining about the events in question and that resolving those issues of fact would require the court to make credibility determinations that are not permitted on summary judgment.  Nonetheless, the district court went on to conclude that summary judgment was appropriate.

instead of coming straight at me, he was trying to get to one side or the other" and that he "couldn't remember" if Hammett was still advancing towards him when Hammett raised his hands.[4]  Whitener similarly testified that Hammett "walked at a fast pace" down the hallway toward the officers.

Horsley went on to state that, as Hammett approached, he took a step toward Hammett with his gun at "high ready" to "try to engage him," and instructed Hammett to put up his hands.  He then lowered his gun slightly as he reached for Hammett, at which point Hammett raised his hands.  Whitener also observed that Horsley was "grabbing towards Mr. Hammett's hands" when Hammett's hands "came up."  When asked whether, "as the hands came up, [she saw] . . . clenched fists or [ . . .] actually s[aw] an object," Whitener said "No.  I couldn't—I don't know.  I didn't see any specific clenched fist or—I don't know if I—I don't really recall if I saw anything, if it was—because it was dark."

With regard to the manner in which Hammett raised his hands, Officer Whitener testified that she thought that both of Hammett's hands were up.  Officer Horsley acknowledged that Hammett raised his right hand but testified that he does not recall what Hammett was doing with his left hand.  The forensic evidence, however, shows that the first bullet fired at Hammett grazed the lateral side of

[4] The officers involved in the shooting of Hammett described the hallway as narrow, and a diagram included in the GBI file from this incident indicated that the hallways was only 15 feet long, and 3 feet wide.  The photographs of the crime scene similarly indicate that the hallway in which Hammett was shot was short and narrow.

40

Hammett's left index finger but did not strike his body and lodged in the wall 52 inches above the ground.  According to Hammett's driver's license he was five feet two inches (62 inches) tall.[5]  Based on this evidence, a reasonable jury could find that when Hammett approached Horsley his hands were up—at least 52 inches above the ground—in seeming compliance with Officer Horsley's instructions.[6]

## B. *The Object in Hammett's Hand*

Second, a jury could find that Hammett was unarmed, and that the officers did not believe that Hammett had a deadly weapon in his hand at the time they shot him.  Horsley stated that, once Hammett exited the bedroom, he saw Hammett move something from his left hand to his right.  He was shining his flashlight at Hammett's hands but "was not able to see an object in his hand at that point."  Whitener also stated that "[d]uring th[at] time, [she] didn't know what was in Hammett's hand" and, moreover, that she couldn't recall if she "could tell if he had an object and was holding his hands like he had something in his hands."  Initially, Horsley thought Hammett had drugs in his hand.  During Horsley's deposition he

---

[5] Horsley and Whitener testified that Hammett's hands were brought up to the level of Horsley's face.  The record demonstrates that Officer Horsley is six feet two inches (74 inches) tall, twelve inches taller than Hammett and twenty-two inches taller than the height at which the bullet entered the wall.

[6] Horsley's opinion that Hammett was "absolutely not" attempting to comply with his commands in raising his hands because "if [Hammett] was going to comply he would comply" immediately and "every time [Horsley has] ever dealt with somebody that was compliant, that's the way it happened" does not rebut Plaintiff's position or eliminate this factual dispute.  It creates, at best, an issue of fact for the jury regarding the credibility and weight that should be afforded to such opinion and conjecture.

explained, "I'm giving him commands, and I'm like, well, maybe he's got dope in his hand, maybe he's going to the bathroom to flush them." Later on in his deposition, Horsley stated that "milliseconds before [he] fired" he saw "a shiny black object" in Hammett's hand. Horsley stated that he believed the "shiny black object" was a can of pepper spray, which the officers were trained to recognize.[7] Both Officer Whitener and Officer Horsley acknowledged their awareness of and training on the Paulding County Sheriff Office's "Use of Force" policy,[8] and their understanding that the use of pepper spray does not constitute deadly force under that policy. A reasonable jury could therefore find on this record that Officers Whitener and Horsley shot at Hammett when they believed that he had either drugs or a canister of pepper spray, despite the fact that the presence of drugs or pepper spray is insufficient under department policy to warrant the use of deadly force.

---

[7] Compounding the myriad inconsistencies in the record are the following non-testimonial accounts of what took place immediately before Hammett was shot. In an affidavit filed in support of a search warrant on October 17, 2012, Sergeant Mike Hill stated that Hammett "removed an item that was later determined to be pepper spray without delay and sprayed Agent Horsley in the face," which led Horsley to shoot him. The CAD police call log relating to the search warrant's execution also notes that an officer was sprayed in the face with pepper spray. On the other hand, Horsley stated that he was not pepper sprayed by Hammett, and a press release issued by the Paulding County Sheriff's Office on October 18, 2012 identified the "shiny black object" in Hammett's hand as a canister of pepper spray, but made no mention of any offensive use of the pepper spray against the officers.

[8] The policy states that "officers shall not use deadly force to seize an unarmed, non-dangerous subject" and that "they may use deadly force … only when the officer reasonably believes that the suspect possesses a deadly weapon or any object which, when used offensively against a person, is likely to or actually does result in serious bodily injury." The policy classifies the use of pepper spray as "Non-Deadly Force" and a "soft physical technique."

## C. *The Order of the Shots Fired at Hammett*

Third, a reasonable jury could find that Whitener fired the first shot, which grazed Hammett's index finger, and that Horsley fired the second shot into Hammett's back after Hammett had turned away from the officers. This finding is supported by both the autopsy report and by Officer Rutherford's testimony. The district court found that Officer Rutherford's testimony did not conflict with the testimony of Officers Horsley and Whitener because "Officer Rutherford testified that Defendant Horsley fell after the second shot that Officer Rutherford heard" and since "Officer Rutherford did not even know three shots were fired . . . it is unknown which two of the three shots he heard." Regardless of which two shots Officer Rutherford heard, however, his testimony necessarily precludes a reading wherein Horsley shot first and had fallen before any shots were fired by Whitener.

While the majority accepts that Rutherford's testimony could support Plaintiff's contention that Whitener shot first and Horsley second, they maintain that this does not vitiate Whitener's claim that her actions were reasonable because—although Whitener initially said that she fired her gun at Hammett when she saw Horsley fall and thought he had been shot—she later said that it was because she saw Hammett move toward Horsley. A reasonable jury could find, however, that shooting a civilian merely because an officer sees him "move toward" a fellow officer, is not objectively reasonable. There is ample caselaw in

43

our circuit to support that proposition. *See*, *e.g.*, *Felio v. Hyatt*, 639 F. App'x 604, 608-09 (11th Cir. 2016) (reversal of a grant of summary judgment on the use of excessive force when a suspected perpetrator on a report of domestic violence—who was engaged in a physical struggle with an officer and was reaching for his gun—was fatally shot in the abdomen, even though "the officers testified that it was a 'dynamic' scene and only a couple seconds passed between [the decedent] reaching for [the officer's] gun and [the officer's] firing"); *Salvato v. Miley*, 790 F.3d 1286, 1290 (11th Cir. 2015) (affirming a denial of summary judgment on the use of excessive force when the police shot a man who resisted arrest, exchanging blows with the officers, then broke free and "rush[ed] towards" the officers and began hitting them again, hitting one officer in the head and knocking her to the ground).

As for Horsley, a reasonable jury could find that the location of the entry wound on Hammett's lower back supports a finding that any perceived threat had abated by the time the second shot was fired, making the use of deadly force unreasonable. Hammett—who, by all accounts, had been facing Horsley head-on when the first shot was fired—somehow had his back to the officers seconds later when the second shot entered his body.[9] The short temporal window in which the

---

[9] I do not understand the basis for the majority's statement that "if Hammett were retreating back down the hallway when he was shot, the bullet would have traveled straight through him, not diagonally from left to right, which would have been impossible." The record does not contain

44

shots were fired therefore does not militate against the conclusion that the use of deadly force was unjustified.[10]

## Conclusion

Taken together, these factual findings could support a legal conclusion that the Defendant Officers acted unreasonably in employing deadly force. The majority concedes this point, acknowledging that "[i]f the evidence could legitimately be interpreted as Plaintiff insists it can, the officers' use of force might have been excessive." They maintain, however, that no such interpretation or reasonable inference can be made. This is not the case. To the contrary, the factual findings outlined here, and by the Plaintiff below, are supported by the forensic and testimonial evidence in the record, by far more than a "scintilla" as the majority dismissively suggests. Because that is the case, the district court erred in granting summary judgment to Defendants Whitener and Horsley.

---

any support for this statement. In fact, given that Officer Horsley was positioned "facing [Hammett] slightly to the left" and Officer Whitener was positioned "on the right side of the hall" it seems highly unlikely that a shot from either would pass straight through him. This interpretation of course—like the majority's statement—is pure speculation.

[10] Moreover, the majority's assertion that "Plaintiff has not pointed to any affirmative evidence that Hammett surrendered and retreated" is irrelevant to a determination of whether summary judgment is warranted if there was no threat to the officers that would warrant the use of deadly force. Reducing the question before the Court to one of whether Plaintiff has proven that Hammett surrendered and retreated unduly broadens the protections of the qualified immunity doctrine and turns the summary judgment standard on its head.

I concede that the majority presents a feasible explanation of the events of October 17, 2012, but that recitation is neither the only reasonable interpretation of the evidence nor the interpretation most favorable to the Plaintiff.[11]   In holding otherwise, the majority has followed the same path as the district court below: they have weighed the evidence and made credibility determinations that fall squarely within the purview of a jury.  It may well be that a jury finds that the subsequent statements of the officers are more persuasive than the initial statements, or that they credit the police officers' account and find it consistent with the forensic evidence.  That does not change the fact, however, that, at the summary judgment stage, the evidence must be construed in the light most favorable to the non-movant, regardless of whether the court feels that one party's version of events is more credible than the other's.  *Lee*, 284 F.3d at 1190 (citing *Priester v. City of Riviera Beach,* 208 F.3d 919, 925 n. 3 (11th Cir.2000) ("[T]his Court has repeatedly stressed [that] the 'facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.'"); *Skrtich v.*

---

[11] The majority's summary of the testimony in this case fails to acknowledge the highly material inconsistencies between the statements given by the officers in their initial GBI interviews, their depositions, and their declarations submitted in support of summary judgment.  The case cited for the proposition that those statements cannot form genuine issues of material fact is inapposite because this case—unlike *Anderson*, which involved libel charges and "discredited" statements—involves multiple statements by the Defendants that have materially changed in the nearly four years between the incident and the most recent declarations given in support of their motions for summary judgment.  Each statement is "affirmative evidence."  The Court should not credit one and discredit another, but it should allow Plaintiff to rely on the earlier statements just as it allows Defendants to rely on the later ones.  Any comparative credibility determinations should be made by a jury at trial, in conjunction with forensic and other testimonial evidence.

*Thornton,* 280 F.3d 1295, 1299 (11th Cir.2002)) ("Nevertheless, for summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the plaintiff.").

Finally, I feel compelled to make an additional observation regarding the majority's decision today. I am concerned by the implications of the majority's view that Plaintiff's claim is undermined by the absence of opposing eyewitness testimony. By characterizing Plaintiff's legitimate interpretation of the physical and forensic evidence as "pure speculation" and "disputed by affirmative evidence . . . most obviously, the officers' testimony," the majority concludes that Plaintiff's interpretation of the physical evidence amounts to conjecture. Granting summary judgment on qualified immunity under these facts therefore sets up a paradigm where, no matter how many inconsistent accounts of an incident an officer gives and no matter what viable theory is supported by forensic evidence, a fourth-amendment claim arising out of a deadly shooting will never survive summary judgment, unless a third-party eye-witness can support Plaintiff's narrative or the plaintiff survives the shooting. This cannot be the evidentiary standard in qualified immunity cases.

In circumstances where, as here, the evidence creates a genuine issue of material fact regarding the conduct of police officers during a deadly shooting, the case should go to trial, where both sides will have a full and fair opportunity to

present their best evidence to a jury.  That jury—and not this Court or the district court below—should then weigh the evidence, make factual findings, and determine the outcome of this case.  For that reason, I respectfully dissent.

Case 4:14-cv-00260-HLM  Document 81-9  Filed 02/19/16  Page 81 of 100

Case: 16-15764    Date Filed: 11/17/2017    Page: 49 of 69



20121059073
3851 Nebo Rd
Hiram, Ga

Not to Scale

1 of 2

Case 4:14-cv-00260-HLM   Document 81-9   Filed 02/19/16   Page 82 of 100
Case: 16-15764   Date Filed: 11/17/2017   Page: 50 of 69

**20121059073**
**3851 Nebo Rd**
**Hiram, Ga**

**1 = 40 Caliber Brass Shell Casing**
**2 = 40 Caliber Silver Shell Casing**
**3 = 40 Caliber Silver Shell Casing**
**4 = OC Spray Can**
**5 = 40 Caliber S&W Speer Bullet**
**6 = Black Shirt**

**Measurements**
**A to 1 = 11'**          **A to 2 = 12'**
**B to 1 = 9 '**          **D to 2 = 14'**

**A to 3 = 12'**          **A to 4 = 15'**
**C to 3 = 4'**           **D to 4 = 7'9**

**A to 5 = 8'5**          **A to 6 = 15'**
**C to 5 = 6'**           **D to 6 = 7'**

USCA 1754                **2 of 2**

GBI 00683

01-0090-34-13







DEFENDANT'S
EXHIBIT
12

Case 4:14-cv-00260-HLM  Document 107  Filed 05/13/16  Page 200 of 218



DEFENDANT'S EXHIBIT 13

Case 4:14-cv-00260-HLM   Document 107   Filed 05/13/16   Page 201 of 218

Case: 16-15764    Date Filed: 11/17/2017    Page: 57 of 69

Case 4:14-cv-00260-HLM    Document 107    Filed 05/13/16    Page 202 of 218





Case 4:14-cv-00269-HLM  Document 107  Filed 05/13/16  Page 203 of 218

DEFENDANT'S
EXHIBIT
16



DEFENDANT'S EXHIBIT
17



DEFENDANT'S
EXHIBIT
18



DEFENDANT'S EXHIBIT
19





Case 4:14-cv-00260-HLM    Document 107    Filed 05/13/16    Page 208 of 218

DEFENDANT'S
EXHIBIT
21







Case 4:14-cv-00260-HLM   Document 107   Filed 05/13/16   Page 213 of 218
Case: 16-15764   Date Filed: 11/17/2017   Page: 67 of 69





Case 4:14-cv-00260-HLM   Document 107   Filed 05/13/16   Page 218 of 218

DEFENDANT'S
EXHIBIT
31



USCA11496
GBI-00525